116 T.C. No. 27


UNITED STATES TAX COURT


DAVID J. LYCHUK AND MARY K. LYCHUK, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 11794-99, 11855-99,          Filed May 31, 2001.
          11863-99.


A acquires and services multiyear installment
contracts as its sole business operations. A acquires
each contract at 65 percent of its face value and is
entitled to all principal and interest payments. A's
employees perform various credit review services in
order to decide whether to acquire each contract
offered to A and, as to the contracts which A chooses
to acquire, perform additional services in paying the
sellers. R determined that all of A's salaries,
benefits, and overhead (printing, telephone, computer,
rent, and utilities) relating to its acquisition (and
not to its service) operation were capital
expenditures. R also determined that A had to
capitalize professional fees and commissions

---

[1] Cases of the following petitioners are consolidated
herewith:  Edward C. and Virginia M. Blasius, docket No. 11855-
99; James E. and Mary Jo Blasius, docket No. 11863-99.

(collectively, offering expenditures) relating to its offering of notes in 1993 and a second offering that was planned in 1993 and abandoned in 1994.

Held: The salaries and benefits are capital expenditures; A's payment of these items was directly related to its anticipated acquisitions of assets with expected useful lives exceeding 1 year.

Held, further, The overhead expenses may be deducted currently under sec. 162(a), I.R.C.; A's payment of these items was not directly related to the anticipated acquisitions, and any future benefit that A received from these expenses was incidental to its payment of them.

Held, further, sec. 165(a), I.R.C., allows A to deduct the portion of the capitalized salaries and benefits that was attributable to installment contracts which it never acquired; A may deduct those amounts for the respective years in which it ascertained that it would not acquire the related contracts.

Held, further, A must capitalize all of the offering expenditures; A's payment of these expenditures was anticipated to provide A with significant future benefits.

Held, further, sec. 165(a), I.R.C., allows A to deduct in 1994 the portion of the capitalized offering expenditures that was attributable to the abandoned offering.


Oksana O. Xenos, for petitioners.*

Eric R. Skinner, for respondent.


LARO, Judge: Petitioners petitioned the Court to redetermine deficiencies attributable primarily to adjustments which respondent made to their income from a subchapter S

---

* Briefs of amici curiae were filed by Robert A. Rudnick, B. John Williams, Jr., James F. Warren, and Richard J. Gagnon, Jr., as counsel for Federal Home Loan Mortgage Corporation (FHLMC), and by Felix B. Laughlin and Anna-Liza Harris as counsel for Federal National Mortgage Association (FNMA).

corporation, Automotive Credit Corporation (ACC). Respondent determined a $1,202 deficiency in the 1993 Federal income tax of David J. and Mary K. Lychuk. Respondent determined $2,149 and $11,461 deficiencies in the 1993 and 1994 Federal income taxes, respectively, of Edward C. and Virginia M. Blasius. Respondent determined $23,683 and $89,609 deficiencies in the 1993 and 1994 Federal income taxes, respectively, of James E. and Mary Jo Blasius.[2] Both Blasius couples alleged in their respective petitions that they had an overpayment for 1994 on account of costs which ACC failed to deduct for that year.

Following concessions, we must decide whether ACC must capitalize certain expenditures made during 1993 and 1994. The expenditures were generally ACC's payment of (1) salaries, benefits, and overhead (printing, telephone, computer, rent, and utilities) relating to its acquisition of retail installment contracts (installment contracts) in the ordinary course of its business (installment contracts expenditures) and (2) professional fees and commissions relating to a private placement offering of notes that ACC accomplished in 1993 and a second offering that ACC planned in 1993 and abandoned in 1994 (collectively, PPM expenditures). We hold that ACC must capitalize both groups of expenditures to the extent described herein. We must also decide whether ACC may deduct the portion

---

[2] James Blasius is Edward Blasius' son.

of the capitalized installment contracts expenditures relating to installment contracts which it never acquired.  We hold it may deduct that portion under section 165(a).[3]  We must also decide whether ACC may deduct the portion of the PPM expenditures relating to the abandoned offering.  We hold it may deduct that portion for 1994 under section 165(a).

## FINDINGS OF FACT

The parties have stipulated many of the facts.  We incorporate herein the parties' stipulation of facts and the exhibits submitted therewith.  We find the stipulated facts accordingly.  Each petitioning couple is a husband and wife who resided in Michigan when their petition was filed.  Each petitioning couple filed a joint Federal income tax return for the relevant years.

ACC is a cash method taxpayer that was incorporated in 1992 and elected shortly thereafter to be taxed as an S corporation for Federal income tax purposes.  It was formed to provide alternate financing for purchasers of used automobiles or light trucks (collectively, automobiles) who have marginal credit.  Its sole business operation is (1) the acquisition of installment contracts from automobile dealers (dealers) who have sold automobiles to high credit risk individuals and (2) the servicing

---

[3] Unless otherwise indicated, section references are to the Internal Revenue Code applicable to the relevant years.  Rule references are to the Tax Court Rules of Practice and Procedure.

of those contracts.  Its primary business activities are credit
investigation, credit evaluation, documentation, and the
monitoring of collections on installment contracts.  Its business
is conducted out of space that it rents in Bingham Farms,
Michigan, pursuant to a 5-year lease that began on October 22,
1992.  Under the lease, ACC pays monthly rent of $3,137.50 during
the first 24 months and $3,250 afterwards.

ACC's shareholders and their respective ownership interests
are as follows:

|                            | 1993 | 1994 |
|----------------------------|------|------|
| James and Mary Jo Blasius  | 77%  | 86%  |
| Edward and Virginia Blasius| 13   | 14   |
| Donald Terns               | 5    | 0    |
| David Lychuk               | 5    | 0    |

None of the shareholders, except James Blasius, works in ACC's
daily business.  The other male shareholders serve as the
directors of ACC's board.

ACC's key management personnel includes its president, James
Blasius, its vice president and chief financial officer, Steven
Balan, its credit manager, Cass Budzynowski, and its credit
investigator, Hope McGee.  During the relevant years, each of
these individuals performed services in connection with ACC's
acquisition of installment contracts.  James Blasius managed
ACC's overall operation and handled personally all contracts with
dealers.  Steven Balan supervised and oversaw ACC's day-to-day
management and its financial and general office management.  Cass

Budzynowski analyzed credit applications and supervised credit investigations. Hope McGee analyzed credit reports and verified all information provided by credit applicants, e.g., by directly contacting employers, banks, and creditors.

ACC pays each of its key management personnel a base salary. Each of these individuals is also entitled to receive an annual bonus at the sole discretion of ACC's board of directors. The bonuses are paid from a "bonus pool" established by ACC and in which ACC places funds in an amount up to 16.25 percent of its pretax net profits. Except in the case of James Blasius, no restrictions exist as to the amount of compensation that ACC may pay to its officers or key employees. James Blasius' bonus is limited to 55 percent of the pool.

Under the terms of each installment contract, an individual buys an automobile from a dealer at a set price to be paid (with interest) in monthly installments. The average rate of interest charged to the buyers is approximately 22 percent. The length of repayment ranges from 12 to 36 months.

ACC and the dealers have an independent agreement under which the dealers sell some of the installment contracts (and the right to the corresponding payments of principal and interest) to ACC at a price equal to 65 percent of each contract's principal amount (i.e., at a 35-percent discount). As of April 30, 1993, ACC acquired the installment contracts from 13 dealers, 3 of

which sold to ACC 69.4 percent of the installment contracts which ACC acquired. ACC is not obligated to acquire all of the installment contracts offered to it by the dealers but generally must decide on whether it will acquire a particular installment contract before the related automobile sale is finalized. ACC rests its decision as to the acquisition of an installment contract on its analysis of the buyer's credit worthiness. That analysis generally includes ACC's review of the buyer's credit application, ACC's obtaining of one or more credit reports on the buyer, ACC's verifying of the buyer's job status, salary, and residence, and ACC's evaluation of various aspects of the buyer's credit history such as payment history and financial stability. If ACC acquires an installment contract, the dealer generally assigns its rights under that contract to ACC as part of the automobile sale, and ACC pays the dealer the 65-percent amount upon ACC's receipt of all of the documents relating to the installment contract. The automobile buyer pays ACC all amounts due under the installment contract, and the automobile buyer collateralizes his or her obligation to make those payments with the purchased automobile.[4] ACC may repossess and sell the automobile if the buyer defaults on the installment contract.

ACC's acquisition of installment contracts generally followed an established procedure. First, ACC would contact

---

[4] ACC services all of the installment contracts it acquires.

dealers and advise them that it was in the business of acquiring installment contracts on an ongoing basis.  Second, ACC would enter into the independent agreement with each dealer that decided to sell its installment contracts to ACC, and the dealer would provide ACC with its sellers license.  Third, the dealer, when faced with a prospective automobile buyer who did not qualify for traditional financing, would alert the buyer to ACC's financing business.  Fourth, a buyer who wanted to finance the purchase with ACC would complete a detailed credit application that the dealer would transmit to ACC by facsimile.  Fifth, ACC would record the application in its daily log and perform its credit review process.  Sixth, to the extent that ACC decided favorably on a credit application, and the buyer accepted ACC's financing arrangement,[5] ACC would issue the dealer a check for the 65-percent amount on the next Friday, or, if ACC had not yet received the requisite documentation from the dealer, on the first Friday after it received that documentation.  One piece of documentation required by ACC was the fully executed installment contract that was printed on a form that bore ACC's name, logo, address, and telephone number.  Upon receipt of this contract, ACC assigned the applicant an account number and entered all applicable information into its computerized collection system.

---

[5] ACC's approval of an application did not always result in its acquisition of the related installment contract.  An applicant sometimes decided for one reason or another not to accept ACC's financing arrangement.

ACC's credit review process generally included six steps, all of which ACC could perform within 3 to 4 hours. First, ACC would access electronically credit bureau reports on the applicant and assign points to certain items shown on the reports. Second, ACC would measure the total points either against preestablished levels for approval or denial or against an arbitrary level of approval or denial that was ascertained intuitively. Third, ACC would analyze through debt-to-income and loan-to-value ratios an applicant's ability to pay the debt, taking into account his or her disposable income and income per dependent. ACC would sometimes perform in connection with this step a budgetary analysis to suggest changes to the loan terms (e.g., by decreasing the monthly payment over a longer time frame) so as to meet preestablished target ratios. Fourth, ACC would conditionally approve or deny an applicant on the basis of all of the information that it had as of yet accumulated. Fifth, as to applications that received a conditional approval, ACC would perform an additional review as to the applicant by verifying (mainly by telephone) his or her employment, residency, and personal references, and by interviewing the applicant by telephone. Sixth, as to the applicants who passed this additional level of review, ACC would communicate to the dealer ACC's approval of the applicant. In some instances, ACC would inform the dealer that it was unwilling to finance the purchase under the terms offered to it but would finance a lesser amount

of principal and/or would finance the purchase over a shorter repayment term.

In 1993 and 1994, ACC paid installment contracts expenditures totaling $267,832 and $339,211, respectively. These expenditures, which were attributable to ACC's obtaining of credit reports and screening of credit histories, related primarily to the portion of ACC's payroll and overhead expenses that was attributable to its credit analysis activities.[6] None of these expenditures included any postacquisition or servicing expenses. ACC ascertained the amount of these expenditures at the request of its independent auditors. The parties agree that these expenditures are "related" to ACC's credit analysis activities and that the breakdown of specific expenditures is as set forth below. The parties dispute whether any or all of the expenditures is "directly related" to ACC's credit analysis activities, as contended by respondent, or is "indirectly related" to those activities, as contended by petitioners.

---

[6] We use the term "credit analysis activities" to refer to ACC's credit review services and its funding services (i.e., ACC's issuance of the checks to dealers in consideration for the installment contracts).

## Breakdown of Specific Expenditures[1]

### 1993

| Employee | Salary And Wages | FICA | MESC/FUTA | BC/BS | Total Expense | Percentage of Total Expenses Related to ACC's Credit Analysis Activities | Amount In Issue |
|---|---|---|---|---|---|---|---|
| Steve Balan | $69,359 | $4,504 | $313 | $4,062 | $78,238 | 50 | $39,119 |
| James Blasius | 89,769 | 4,713 | 313 | 4,062 | 98,857 | 75 | 74,143 |
| Cass Budzynowski | 43,500 | 3,213 | 313 | 1,790 | 48,816 | 100 | 48,816 |
| Hope McGee | 16,248 | 1,216 | 313 | 3,692 | 21,469 | 100 | 21,469 |
| Kelly | 16,100 | 1,193 | 313 | 1,790 | 19,396 | 100 | 19,396 |
| Stacey | 10,280 | 767 | 313 | 2,086 | 13,446 | 75 | 10,085 |
|  | 245,256 | 15,606 | 1,878 | 17,482 | 280,222 |  | 213,028 |

Overhead Items

| | | | | | Total Expense | Percentage | Amount In Issue |
|---|---|---|---|---|---|---|---|
| Printing |  |  |  |  | 9,412 | 75 | 7,059 |
| Telephone |  |  |  |  | 12,454 | 75 | 9,341 |
| Computer |  |  |  |  | 19,598 | 95 | 18,618 |
| Rent |  |  |  |  | 34,413 | 50 | 17,207 |
| Utilities |  |  |  |  | 5,162 | 50 | 2,581 |
|  |  |  |  |  | 81,039 |  | 54,806 |
|  |  |  |  |  | 361,261 |  | [2]267,832 |

### 1994

| Employee | Salary, Wages, and Estimated Bonus | FICA | MESC/FUTA | BC/BS | Total Expense | Percentage of Total Expenses Related to ACC's Credit Analysis Activities | Amount In Issue |
|---|---|---|---|---|---|---|---|
| Steve Balan | $95,820 | $4,886 | $218 | $4,932 | $105,856 | 40 | $42,342 |
| James Blasius | 139,216 | 5,776 | 218 | 4,932 | 150,142 | 50 | 75,071 |
| Cass Budzynowski | 52,846 | 3,813 | 218 | 2,177 | 59,054 | 100 | 59,054 |
| Hope McGee | 11,508 | 842 | 218 | 4,932 | 17,500 | 100 | 17,500 |
| Kelly | 22,200 | 1,584 | 218 | 2,177 | 26,179 | 100 | 26,179 |
| Sue | 24,500 | 1,760 | 218 | 4,932 | 31,410 | 100 | 31,410 |
| Kathy | 16,921 | 1,256 | 218 | 4,932 | 23,327 | 75 | 17,495 |
| Stacey | 1,218 | 93 | 32 | 411 | 1,754 | 75 | 1,316 |
| Kirsten | 2,438 | 167 | 57 | 181 | 2,843 | 100 | 2,843 |
|  | 366,667 | 20,177 | 1,615 | 29,606 | 418,065 |  | 273,210 |

Overhead Items

| | | | | | Total Expense | Percentage | Amount In Issue |
|---|---|---|---|---|---|---|---|
| Printing |  |  |  |  | 8,663 | 75 | 6,497 |
| Telephone |  |  |  |  | 15,133 | 60 | 9,080 |
| Computer |  |  |  |  | 25,919 | 95 | 24,623 |
| Rent |  |  |  |  | 37,875 | 60 | 22,725 |
| Utilities |  |  |  |  | 5,126 | 60 | 3,076 |
|  |  |  |  |  | 92,716 |  | 66,001 |
|  |  |  |  |  | 510,781 |  | 339,211 |

[1] The record does not indicate the surname of each of the listed employees.  Nor does the record indicate the job titles of the employees listed without a surname or describe their daily duties.

[2]  The parties agree than this column equals $267,832.  Actually, it equals $267,834.  Because the $2 unexplained difference is immaterial to our analysis, we use the parties' figure of $267,832.

ACC deducted the installment contracts expenditures of

$267,832 on its 1993 Federal income tax return, and it deducted

$288,911 of the $339,211 in installment contracts expenditures on its 1994 Federal income tax return. ACC now claims that it was entitled to deduct for 1994 the remaining $50,300 of installment contracts expenditures ($339,211 - $288,911). As to the respective years, ACC deducted officers' compensation of $158,099 and $217,036 and salaries/wages of $126,464 and $194,306. The portion of the officers' compensation, salaries/wages, and overhead which was deducted but not in issue is attributable to ACC's servicing of the installment contracts.

For financial accounting purposes, ACC separately listed the installment contracts as assets on its 1993 and 1994 balance sheets. In addition, ACC initially deducted the installment contracts expenditures of $267,832 for 1993 but amended that year's financial statements to amortize the expenditures over the expected life of the related installment contracts. ACC's independent auditors required the amendment and related amortization in order to comply with Statement of Financial Accounting Standards No. 91 (SFAS 91), Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases.[7] ACC

---

[7] The record does not indicate why ACC's auditors believed that the amendment was required under SFAS 91. Whereas SFAS 91 provides explicitly for the deferral of "direct loan origination costs", it does not provide similarly as to the direct costs of acquiring loans. SFAS 91 provides as to the acquisition of loans that "15. The initial investment in a purchased loan or group of loans shall include the amount paid to the seller plus any fees
(continued...)

amortized the installment contracts expenditures of $339,211 over the expected lives of the related installment contracts for 1994.

ACC performed its credit review services as to approximately 1,824 credit applications in 1993 and approximately 2,158 credit applications in 1994. As to those applications, ACC acquired 693 installment contracts in 1993 and 820 installment contracts in 1994; in other words, ACC acquired in each year approximately 38 percent of the installment contracts which were offered to it. The original terms of the 1993 installment contracts averaged 23.89 months, and their actual duration averaged 17.5 months. The original terms of the 1994 installment contracts averaged 29 months, and their actual duration averaged 19.5 months. Of the 693 installment contracts acquired in 1993, 182 had an actual duration of 12 months or less. Of the 820 installment contracts acquired in 1994, 217 had an actual duration of 12 months or less.

ACC issued a private placement memorandum (PPM) on April 30, 1993, offering up to $2.4 million of its subordinated asset

---

[7](...continued)
paid or less any fees received. * * *  All other costs incurred in connection with acquiring purchased loans or committing to purchase loans shall be charged to expense as incurred." We note in passing, however, that rules such as SFAS 91 which are compulsory for financial accounting purposes do not control the proper characterization of an item for Federal income tax purposes. See Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 542-543 (1979); see also Old Colony R.R. Co. v. Commissioner, 284 U.S. 552, 562 (1932).

backed notes (Notes).  ACC intended through the offering to raise funds for its current operation, including the acquisition of installment contracts which would be (and were) pledged to secure ACC's obligations under the Notes.  The Notes matured in 36 months but could be redeemed by the noteholders at 12 or 24 months.  The Notes bore interest at 12 percent during the first year, 13 percent during the second year, and 14 percent during the final year.  The Notes were purchased by approximately 50 investors, and approximately five of these investors redeemed their Notes before maturity.

East-West Capital Corporation (East-West) sold the Notes on ACC's behalf and was paid a commission equal to 4 percent of the principal amount of the Notes sold, plus 1 percent of the principal outstanding at 12 months, plus 1 percent of the principal outstanding at 24 months.  Included in East-West's commission was a 1 percent due diligence fee.

ACC deducted $29,647, $38,239, and $33,783 of offering expenses, commissions, and professional fees, respectively, for 1993.  ACC deducted $36,251, $74,361, and $110,432 of offering expenses, commissions, and professional fees, respectively, for 1994.  The deductions for 1993 and 1994 included costs attributable to a second private placement offering that was planned in 1993 and abandoned in 1994.

Respondent audited ACC's 1993 and 1994 taxable years.  As to 1993, respondent disallowed $198,626 of installment contracts expenditures deducted by ACC, determining that these expenses were capital expenditures relating to assets having a life exceeding one year.[8]  Respondent also disallowed $55,027 and $66,652 of PPM expenditures deducted by ACC for 1993 and 1994, respectively, determining that these expenditures were capital expenditures which had to be amortized over the terms of the Notes.  The $55,027 included legal fees of $7,274 and a registration fee of $1,250 paid in 1993 for the private placement offering that ACC abandoned in 1994.  The $66,652 included legal fees of $21,792 paid in 1994 for the private placement offering that ACC abandoned in 1994.  The remaining adjustments as to the PPM expenditures consisted of legal fees and commissions paid in connection with the PPM.

## OPINION

We must decide whether ACC may expense any of the disputed costs or must capitalize them as expenditures to be deducted in later years.  Income tax deductions are a matter of legislative grace, and petitioners bear the burden of proving ACC's entitlement to the claimed deductions.  See Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Interstate Transit

---

[8] Respondent made no adjustment to ACC's deduction of installment contracts expenditures for 1994.

Lines v. Commissioner, 319 U.S. 590, 593 (1943).  For Federal income tax purposes, the principal difference between classifying a payment as a deductible expense or a capital expenditure concerns the timing of the taxpayer's recovery of the cost.  As the Supreme Court has observed:

> The primary effect of characterizing a payment as either a business expense or a capital expenditure concerns the timing of the taxpayer's cost recovery: While business expenses are currently deductible, a capital expenditure usually is amortized and depreciated over the life of the relevant asset, or, where no specific asset or useful life can be ascertained, is deducted upon dissolution of the enterprise.  * * *  Through provisions such as these, the Code endeavors to match expenses with the revenues of the taxable period to which they are properly attributable, thereby resulting in a more accurate calculation of net income for tax purposes. * * * [INDOPCO, Inc. v. Commissioner, supra at 83-84.]

Our inquiry begins with the installment contracts expenditures.  Respondent determined and maintains that ACC must capitalize these expenditures to the extent stated herein. Respondent argues primarily that these expenditures are capital expenditures because they were related to ACC's acquisition of separate and distinct assets; i.e., the installment contracts. Respondent argues secondly that ACC's payment of the installment contracts expenditures provided it with significant future benefits in that it was able to acquire the installment contracts which produced income for it in later years.  Petitioners maintain that the installment contracts expenditures are currently deductible.  Petitioners agree that the expenditures

are related to the acquisition of the installment contracts but argue primarily that the expenditures are deductible as routine, recurring business expenses arising primarily from an employment relationship rather than from a capital transaction. Petitioners argue secondly that the installment contracts expenditures are deductible because they are not described in either section 263(a) or the related regulations.

We agree with respondent in part and with petitioners in part. We agree with respondent that ACC must capitalize the installment contracts expenditures to the extent of the salaries and benefits.[9] We conclude that ACC's payment of the salaries and benefits was directly related to its acquisition of the installment contracts. We agree with petitioners that ACC may

---

[9] We allow ACC to deduct under sec. 165(a) the portion of those expenditures that was attributable to the installment contracts which it never acquired. ACC may deduct those amounts for the respective years in which it ascertained that it would not acquire the related contracts. See Ellis Banking Corp. v. Commissioner, 688 F.2d 1376, 1382 (11th Cir. 1982), affg. in part and remanding in part T.C. Memo. 1981-123. See generally PNC Bancorp, Inc. v. Commissioner, 110 T.C. 349, 359, 362 (1998) (Commissioner allowed banks to deduct loan origination costs expended in connection with loans which were not successfully approved), revd. on other grounds 212 F.3d 822 (3d Cir. 2000). Respondent argues that petitioners have failed to prove the portion of the expenditures attributable to the installment contracts which it never acquired. We disagree. We have found as a fact that ACC did not acquire approximately 62 percent of the installment contracts which were offered to it in each of the subject years. We hold that ACC may deduct for 1993 and 1994 62 percent of the installment contracts expenditures attributable to installment contracts which in those years it decided not to acquire. See Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930).

currently deduct the installment contracts expenditures to the extent of the overhead expenses. We conclude that ACC's payment of the overhead expenses was not directly related to the anticipated acquisition of any of the installment contracts. We also conclude that any future benefit that ACC received from the overhead expenses was incidental to its payment of them. As discussed in detail below, we believe that the Supreme Court's mandate as to capitalization requires that an expenditure be capitalized when it: (1) Creates or enhances a separate and distinct asset, see Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345, 354 (1971), (2) produces a significant future benefit, see INDOPCO, Inc. v. Commissioner, supra at 87-89, or (3) is incurred "in connection with" the acquisition of a capital asset,[10] Commissioner v. Idaho Power Co., 418 U.S. 1, 13 (1974); see Woodward v. Commissioner, 397 U.S. 572, 575-576 (1970). Given the Supreme Court's pronouncement in Woodward v. Commissioner, supra at 577, that an acquisition-related

_____

[10] We, like the Court of Appeals for the Eleventh Circuit in Ellis Banking Corp. v. Commissioner, supra at 1379, understand the term "capital asset" to be used for this purpose in its accounting sense to encompass any asset with a useful life exceeding 1 year. See also United States v. Akin, 248 F.2d 742, 744 (10th Cir. 1957) ("it may be said in general terms that an expenditure should be treated as one in the nature of a capital outlay if it brings about the acquisition of an asset having a period of useful life in excess of one year". Such an understanding is directly consistent with the Secretary's interpretation set forth in sec. 1.263(a)-2(a), Income Tax Regs., of examples of property for which the costs of acquisition are capital expenditures.

expenditure is a capital expenditure when its origin "is in the process of acquisition itself", we understand the phrase "in connection with" in the third situation to mean that the expenditure must be directly related to the acquisition.

Our analysis begins with the relevant statutory text. We apply that text in accordance with the related Treasury income tax regulations, the validity of which has not been challenged by either party, and the interpretation of that text and those regulations primarily by the United States Supreme Court. Section 162(a) provides that "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". The Treasury regulations specify that ordinary and necessary business expenses include "the ordinary and necessary expenditures directly connected with or pertaining to the taxpayer's trade or business", sec. 1.162-1(a), Income Tax Regs., such as "a reasonable allowance for salaries or other compensation for personal services actually rendered", sec. 1.162-7(a), Income Tax Regs. The Supreme Court has explained that a cash method taxpayer such as ACC may deduct an expenditure under section 162(a) if the expenditure is: (1) An expense, (2) an ordinary expense, (3) a necessary expense, (4) paid during the taxable year, and (5) made to carry on a trade or business. See Commissioner v. Lincoln Sav. & Loan Association, supra at

352-353. The Supreme Court has stated that a necessary expense is an expense that is appropriate or helpful to the development of the taxpayer's business, see Commissioner v. Tellier, 383 U.S. 687, 689 (1966); Welch v. Helvering, 290 U.S. 111, 113-115 (1933), and that an ordinary expense is an expense that is "normal, usual, or customary" in the type of business involved, Deputy v. du Pont, 308 U.S. 488, 495-496 (1940); see also Welch v. Helvering, supra at 113-115. The Supreme Court has observed that the need for an expenditure to be ordinary serves, in part, to "clarify the distinction, often difficult, between those expenses that are currently deductible and those that are in the nature of capital expenditures, which, if deductible at all, must be amortized over the useful life of the asset." Commissioner v. Tellier, supra at 689-690.

The fact that a payment falls within a literal reading of section 162(a) does not necessarily mean that the payment is deductible. Sections 161 and 261, for example, except certain payments from the current deductibility provision of section 162(a). See INDOPCO, Inc. v. Commissioner, 503 U.S. at 84. Section 161 provides that "there shall be allowed as deductions the items specified in * * * [section 162(a)], subject to the exceptions provided in * * * sec. 261 and following, relating to items not deductible". Section 261 provides that "no deduction

shall in any case be allowed in respect of the items specified in this part"; i.e., part IX (Items Not Deductible).

Section 263 is included in part IX. Section 263(a) provides, in language that dates back to the Revenue Act of 1864, sec. 117, 13 Stat. 282, see United States v. Hill, 506 U.S. 546, 556 n.6 (1993) ("section 263(a)(1) has one of the longest lineages of any provision in the Internal Revenue Code."), that "No deduction shall be allowed for--(1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." The Treasury regulations interpret this text by listing the following item as an example of a capital expenditure: "The cost of acquisition, construction, or erection of buildings, machinery and equipment, furniture and fixtures, and similar property having a useful life substantially beyond the taxable year." Sec. 1.263(a)-2(a), Income Tax Regs.

The determination of whether an expenditure is deductible under section 162(a) or must be capitalized under section 263(a) is not always a straightforward or mechanical process. "[E]ach case 'turns on its special facts'", and "the cases sometimes appear difficult to harmonize." INDOPCO, Inc. v. Commissioner, supra at 86 (quoting Deputy v. du Pont, supra at 496).

In accordance with the current law on capitalization, an expenditure may be deductible in one setting but capitalizable in

a different setting.  For example, in <u>Commissioner v. Idaho Power Co.</u>, 418 U.S. at 13, the Supreme Court observed the following as to wages paid by a taxpayer in its trade or business:

> Of course, reasonable wages paid in the carrying on of a trade or business qualify as a deduction from gross income.  * * *  But when wages are paid in connection with the construction or acquisition of a capital asset, they must be capitalized and are then entitled to be amortized over the life of the capital asset so acquired.  * * *

Similarly, in <u>Ellis Banking Corp. v. Commissioner</u>, 688 F.2d 1376, 1379 (11th Cir. 1982), affg. in part and remanding in part T.C. Memo. 1981-123, the Court of Appeals for the Eleventh Circuit observed as to business expenses in general:

> an expenditure that would ordinarily be a deductible expense must nonetheless be capitalized if it is incurred in connection with the acquisition of a capital asset.[6]
>
> > [6]We do not use the term "capital asset" in the restricted sense of section 1221. Instead, we use the term in the accounting sense, to refer to any asset with a useful life extending beyond one year.

Accord <u>American Stores Co. & Subs. v. Commissioner</u>, 114 T.C. 458 (2000) (taxpayer required to capitalize legal fees incurred to defend against State antitrust suit arising out of, and connected to, prior stock acquisition); cf. <u>Stevens v. Commissioner</u>, 46 T.C. 492, 497 (1966) (otherwise deductible business expenses are capital expenditures when paid to acquire a capital asset), affd. 388 F.2d 298 (6th Cir. 1968); <u>X-Pando Corp. v. Commissioner</u>, 7 T.C. 48, 51-53 (1946) (salary, rent, advertising, and traveling

expenses which would ordinarily be deductible may be a capital expenditure if made to cultivate or develop business, the benefits of which will be realized in future years).

The just-quoted observations of the Supreme Court and the Court of Appeals for the Eleventh Circuit in the Idaho Power Co. and Ellis Banking Corp. cases, respectively, reflect a longstanding, firmly established body of law under which expenditures incurred "in connection with" the acquisition of a capital asset are considered capital expenditures includable in the acquired asset's tax basis.[11]  Commissioner v. Idaho Power Co., supra at 13; see Woodward v. Commissioner, 397 U.S. at 575 ("It has long been recognized, as a general matter, that costs incurred in the acquisition or disposition of a capital asset are to be treated as capital expenditures"); see also Johnsen v. Commissioner, 794 F.2d 1157, 1162 (6th Cir. 1986) ("costs incurred in connection with the acquisition or construction of a capital asset are capital expenditures"), revg. on other grounds 83 T.C. 103 (1984); Ellis Banking Corp. v. Commissioner, supra at

---

[11] The Commissioner has had a similar longstanding view. See, e.g., Rev. Rul. 73-580, 1973-2 C.B. 86 (portion of compensation paid by corporation to its employees that is attributable to services performed in connection with corporate acquisitions is a capital expenditure); Rev. Rul. 69-331, 1969-1 C.B. 87 (bonuses and commissions paid by gas distributor to secure long-term leases for hot water heaters are capital expenditures); Rev. Rul. 57-400, 1957-2 C.B. 520 (commissions paid by bank to brokers and other third parties for introduction of acceptable applicants for mortgage loans are capital expenditures).

1379 ("an expenditure that would ordinarily be a deductible expense must nonetheless be capitalized if it is incurred in connection with the acquisition of a capital asset"); cf. A.E. Staley Manufacturing Co. & Subs. v. Commissioner, 119 F.3d 482, 489 (7th Cir. 1997) (costs are capital expenditures if they are "associated with" facilitating a capital transaction), revg. on other grounds and remanding 105 T.C. 166 (1995); Central Tex. Sav. & Loan Association v. United States, 731 F.2d 1181, 1184 (5th Cir. 1984) ("expenditures incurred in the acquisition of a capital asset must generally be capitalized"); Commissioner v. Wiesler, 161 F.2d 997, 999 (6th Cir. 1947) ("well settled rule that expenditures incurred as an incident to the acquisition or sale of property are not ordinary and necessary business expenses, but are capital expenditures which must be added to the cost of the property"), affg. 6 T.C. 1148 (1946).

Capitalizable expenditures are not limited to the actual price that the buyer pays to the seller for the asset but include, for example, the payment of legal, brokerage, accounting, appraisal and other "ancillary" expenses related to the asset's acquisition. Woodward v. Commissioner, supra at 576-577; see United States v. Hilton Hotels Corp., 397 U.S. 580 (1970); see also Ellis Banking Corp. v. Commissioner, supra at 1379. Capitalizable expenditures also include compensation paid for services performed in connection with an asset's acquisition,

including "a reasonable proportion of the wages and salaries of employees who spend some of their working hours laboring on the acquisition". Briarcliff Candy Corp. v. Commissioner, 475 F.2d 775, 781 (2d Cir. 1973), revg. on other grounds and remanding T.C. Memo. 1972-43; see Commissioner v. Idaho Power Co., supra at 13; see also Cagle v. Commissioner, 539 F.2d 409, 416 (5th Cir. 1976), affg. 63 T.C. 86 (1974); Perlmutter v. Commissioner, 44 T.C. 382, 404 (1965), affd. 373 F.2d 45 (10th Cir. 1967); cf. Strouth v. Commissioner, T.C. Memo. 1987-552 (costs of securing potential leases, including checking the lessee's credit, reviewing the lease application, and drafting the lease documents are capital expenditures).

When the Supreme Court was faced with the question as to the capitalization of litigation costs incurred appraising the stock of minority shareholders in connection with the majority shareholder's acquisition of that stock, the Court held that the central inquiry was whether the expenditure originated in "the process of acquisition". Woodward v. Commissioner, supra at 577. In other words, the Court set its focus on the directness of the costs' relationship to the acquisition and adopted a test under which costs originating in the process of acquiring a capital asset are considered capital expenditures.

We believe that the application of the "process of acquisition" test is appropriate here.[12]  Both this Court and the Court of Appeals for the Ninth Circuit applied the process of acquisition test in Honodel v. Commissioner, 76 T.C. 351 (1981), affd. 722 F.2d 1462 (9th Cir. 1984), to decide whether the taxpayer/investors could deduct two types of fees which they paid to an investment advisory and financial management company.  The first fee was a nonrefundable monthly retainer that the taxpayers paid for investment counsel and advice.  The amount of this fee depended on the investor's income level and the investor's financial planning, tax advice, and investment needs.  The second fee was a one-shot charge for services rendered in connection with each investment acquired.  The amount of this fee equaled a specific percentage of the investment's cost.  We allowed the taxpayers to deduct the monthly fees but required them to capitalize the one-shot fees.  We focused on whether the services performed by the investment adviser were performed in the process of acquisition or for investment advice.  We concluded that the services relating to the monthly fee did not arise out of that process but that the services relating to the one-shot fee did.  See id. at 363-368.  The Court of Appeals for the Ninth Circuit agreed.  See Honodel v. Commissioner, 722 F.2d 1462 (9th Cir.

_____

[12] This approach is consistent with a test suggested by the amicus for FHLMC.

1984). Thus, while the monthly fees were connected to an acquisition in the sense that they were required to be paid in order to consummate any acquisition, both this Court and the Court of Appeals for the Ninth Circuit acknowledged that the fees were insufficiently connected with an acquisition to require their capitalization. The process of acquisition test, therefore, does not simply rest on whether an expenditure is somehow connected to an asset acquisition but focuses more appropriately on whether the expenditure was directly related to that acquisition.

We apply the process of acquisition test to the facts at hand. The salaries and benefits are a capital expenditure if the underlying services were performed in the acquisition process, or, in other words, were directly related to ACC's anticipated acquisition of installment contracts. See Woodward v. Commissioner, 397 U.S. 572 (1970); Honodel v. Commissioner, supra. We conclude that the underlying services were performed in that process; i.e., the services were directly related to ACC's anticipated acquisition of installment contracts. Each of the employees spent a significant portion of his or her time working on credit analysis activities, which was the first (and, in ACC's business, an indispensable) step in ACC's acquisition process, and, but for ACC's anticipated acquisition of installment contracts, ACC would not have incurred the salaries

and benefits attributable to those activities.[13]  The credit review activities were so inexorably tied to and such an integral part of the acquisition process that the portion of the salaries and benefits attributable thereto must be considered as part of the cost of the installment contracts.  To be sure, the Supreme Court in Commissioner v. Idaho Power Co., 418 U.S. at 13, even considered the tools and materials used by the construction workers, in addition to the wages of the workers themselves, as part of the capital asset's cost, as did the court in Ellis Banking Corp. v. Commissioner, 688 F.2d 1376 (11th Cir. 1982), with respect to office supplies, filing fees, travel expenses, and accounting fees.  We hold that the salaries and benefits are capital expenditures to the extent that the parties have agreed that those costs are attributable to the credit analysis activities.[14]

---

[13] As a matter of fact, ACC admitted as much in its PPM when it stated:

> In the event only a minimal amount of Notes are sold pursuant to this Offering, the Company [ACC] would have to downsize its operations and could, in fact, operate with its current portfolio of retail installment contracts with as few as three (3) individuals, including the President of the Company, James Blasius.

[14] To the extent that the specific work performed by each individual as to the acquisition process is not contained in the record, petitioners bear the consequences of any deficiency in the record as they bear the burden of disproving respondent's determination that the costs of the services and benefits at issue are capital expenditures.

As to the overhead expenses, we conclude and hold differently.  Those expenses are capital expenditures to the extent that they originated in ACC's acquisition process, or, in other words, were directly related to ACC's anticipated acquisition of installment contracts.  We are unable to find that such was the case.  None of these routine and recurring expenses originated in the process of ACC's acquisition of installment contracts, nor, in fact, in any anticipated acquisition at all.  ACC would have continued to incur most of these expenses in the ordinary course of its business had its business only been to service the installment contracts.  The items of rent and utilities, for example, were generally fixed charges which had no meaningful relation to the number of credit applications analyzed (or the number of installment contracts acquired) by ACC.  Nor did the printing expense have any such meaningful relation.  In fact, ACC's printing costs were less in 1994 than in 1993, even though ACC analyzed 18.3 percent more credit applications (and acquired 18.3 percent more installment contracts) in 1994 than in 1993.  Although ACC's telephone and computer costs did increase in 1994 from the prior year, we are unable to discern from the record any direct relationship between that increase and the increase from the prior year in credit applications analyzed and/or installment contracts acquired so as to require capitalization of those costs.

We recognize that the Court in <u>Perlmutter v. Commissioner</u>, 44 T.C. at 403-405, required the taxpayer there to capitalize a portion of his utilities as sufficiently connected to a capital transaction. In that regard, the <u>Perlmutter</u> case is distinguishable from the case at hand in that the <u>Perlmutter</u> case preceded <u>Woodward v. Commissioner</u>, <u>supra</u>, and the related process of acquisition test. We also distinguish the printing costs at hand from the printing costs in <u>A.E. Staley Manufacturing Co. & Subs. v. Commissioner</u>, 119 F.3d at 492-493, the latter of which we and the Court of Appeals for the Seventh Circuit considered as associated with a capital transaction. The printing costs there, unlike those here, were required to be incurred by the taxpayer so as to facilitate communication with shareholders and others in connection with the transaction. See <u>A.E. Staley Manufacturing Co. & Subs. v. Commissioner</u>, 105 T.C. at 180, 197.

Respondent argues that ACC's payment of the overhead expenses produced for it a significant future benefit requiring capitalization under <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79 (1992). We disagree. On the basis of our discussion above, we conclude that any future benefit that ACC realized from these expenses was incidental to its payment of them so as not to require capitalization on that theory. See <u>id.</u> at 87-88.

Petitioners argue that the salaries and benefits are ipso facto deductible because they are the routine, recurring expenses

of ACC's business.[15]  Petitioners make three assertions in

support of this argument.  Petitioners first assert that the

salaries and benefits are fixed costs which flow from an

employment agreement and are not dependent upon the occurrence of

a capital transaction.  In this regard, petitioners contend, the

amounts of the salaries and benefits paid by ACC are unaffected

by the quantity, principal amount, or duration of the installment

contracts, and those items would have been incurred even without

the acquisition of an installment contract.  Petitioners assert

secondly that the salaries and benefits are deductible under a

literal reading of section 1.162-1(a), Income Tax Regs.  The

relevant text of that section allows a taxpayer to deduct

reasonable compensation that is "directly connected with or

pertaining to the taxpayer's trade or business".  Petitioners

assert thirdly that the salaries and benefits are deductible

under the established jurisprudence of First Sec. Bank of Idaho,

N.A. v. Commissioner, 592 F.2d 1050 (9th Cir. 1979), affg. 63

T.C. 644 (1975); First Natl. Bank of South Carolina v. United

States, 558 F.2d 721 (4th Cir. 1977); Colorado Springs Natl. Bank

v. United States, 505 F.2d 1185 (10th Cir. 1974); and Iowa-Des

Moines Natl. Bank v. Commissioner, 68 T.C. 872 (1977), affd. 592

---

[15] The amicus for FNMA also advances this argument.

F.2d 433 (8th Cir. 1979) (collectively, credit card cases).[16] Petitioners assert that the credit card cases hold that recurring expenses are deductible under section 162(a) whenever the expenses are incurred in the ordinary course of business. Petitioners also point to INDOPCO, Inc. v. Commissioner, supra, and contend that the Supreme Court acknowledged there that an expense's recurring nature is critical to qualifying it as deductible under section 162(a).

We disagree with petitioners' argument that section 162(a) allows ACC to deduct the expenses that recur in the ordinary course of its business merely by virtue of the fact that the expenses are everyday and/or routine in nature. In order for a payment to be deductible under section 162(a), the underlying expense must not only be "normal, usual, or customary" in the type of business involved, Deputy v. du Pont, 308 U.S. at 495, it must be realized and exhausted in the year of payment, see Stevens v. Commissioner, 388 F.2d at 300. Although an employer's payment of salaries and benefits similar to the ones at issue will usually generate for the employer benefits that will be realized and exhausted in the year of payment, the same is not true when those items are directly related to the employer's acquisition of a capital asset such as an installment contract.

---

[16] Petitioners also rely on Bankers Dairy Credit Corp. v. Commissioner, 26 B.T.A. 886 (1932).

The benefits which ACC will reap from the installment contracts; namely, interest and excess principal income,[17] will not be realized and exhausted within the year of payment.  ACC will realize those benefits in each of the later years in which the interest and excess principal are received.  Given the Supreme Court's observation in INDOPCO, Inc. v. Commissioner, supra at 83-84, that our tax law endeavors to measure taxable income by allowing expenses to be deducted in the taxable year in which the related income is recognized, see also Newark Morning Ledger Co. v. United States, 507 U.S. 546, 565 (1993); Hertz Corp. v. United States, 364 U.S. 122, 126 (1960), it is only appropriate to defer ACC's deduction of its payment of any expenses directly related to that interest or excess principal income to the years in which ACC recognizes the income.[18]  Only then will ACC's taxable income be calculated more accurately for tax purposes than if ACC had deducted those expenses currently.

We find instructive to our decision the case of Helvering v. Winmill, 305 U.S. 79 (1938), revg. 93 F.2d 494 (2d Cir. 1937),

---

[17] We use the term "excess principal" to refer to the principal on the installment contracts that exceeded 65 percent of their face value.

[18] The salaries and benefits were instrumental to the production of that income in that ACC would not have acquired any of the installment contracts without performing its credit analysis activities.  In this regard, we disagree with the amicus representing FNMA that all of ACC's salaries and benefits are indirect expenses to which sec. 263(a) does not apply in the first place.

revg. and remanding 35 B.T.A. 804 (1937).  There, the taxpayer claimed that he could deduct as compensation brokerage commissions paid to acquire securities in the ordinary course of his business.  The Commissioner had disallowed the deduction, determining that the payments were capital expenditures.  The taxpayer argued that it could deduct the payments because, he asserted, they were an ordinary and necessary business expense.  The taxpayer asserted that he was in the business of buying and selling securities.  A divided Board of Tax Appeals sustained the Commissioner's disallowance.  See Winmill v. Commissioner, 35 B.T.A. 804 (1937).  The Court of Appeals for the Second Circuit disagreed with the Board, holding that the payments were deductible if the taxpayer was in fact engaged in the business of buying and selling securities.  See Winmill v. Commissioner, 93 F.2d 494 (2d Cir. 1937).  The Supreme Court held that the payments were capital expenditures.  The Supreme Court noted that the Treasury regulations (Regs. 77, art. 282 (1932)[19]) set forth a longstanding position that commissions paid in acquiring securities are considered part of the securities' cost and stated:  "The fact--if it be a fact--that * * * [the taxpayer] was engaged in the business of buying and selling securities does

---

[19] The substance of these regulations regarding commissions paid to acquire securities has been carried forward into sec. 1.263(a)-2(e), Income Tax Regs.

not entitle him to take a deduction contrary to this provision."
Helvering v. Winmill, 305 U.S. at 84.

Petitioners argue that Helvering v. Winmill, supra, is
irrelevant.  Petitioners recognize that the taxpayer in the
Winmill case, similar to petitioners here, relied on a provision
in the regulations that provided specifically that compensation
paid in the ordinary course of business qualified as a deductible
expense.  Petitioners distinguish the Winmill case by noting that
another provision in those regulations provided specifically that
"commissions paid in purchasing securities are a part of the cost
price of such securities."  Regs. 77, art. 282 (1932).
Petitioners conclude that the Supreme Court's holding in the
Winmill case rested solely on the presence of the second
provision and assert that no similar provision exists here to
preclude explicitly its deduction of the salaries and benefits.
Petitioners also note that the instant facts are different than
Winmill in that ACC is not a securities dealer, the installment
contracts are not securities, and none of the installment
contracts expenditures are commissions.

We disagree with petitioners' assertion that Helvering v.
Winmill, supra, is irrelevant.  We, like the Supreme Court in the
Winmill case, focus on a specific, longstanding position set
forth in the Treasury regulations to conclude that the salaries
and benefits must be capitalized even though, in a different

setting, those costs may have qualified for deduction under a more general regulatory provision. Specifically, whereas section 1.162-1(a), Treasury Income Tax Regs., provides generally that "the ordinary and necessary expenditures directly connected with or pertaining to the taxpayer's trade or business" are deductible expenses, section 1.263(a)-2(a), Income Tax Regs., provides specifically that capitalized expenditures include "The cost of acquisition, construction, or erection of buildings, machinery and equipment, furniture and fixtures, and similar property having a useful life substantially beyond the taxable year." We disagree with petitioners when they assert that this latter provision does not preclude explicitly ACC's deduction of the salaries and benefits. The installment contracts, similar to the buildings, machinery and equipment, and furniture and fixtures listed specifically in section 1.263(a)-2(a), Income Tax Regs., have anticipated useful lives extending substantially beyond the taxable year of the related expenditures.[20] We also disagree

---

[20] Petitioners argue that the installment contracts are not "similar" to the examples in the regulations and, hence, expenditures connected thereto need not be capitalized. We disagree. We understand the word "similar" to encompass any property that, like the examples, has a useful life extending substantially beyond the taxable year of the related expenditure. Petitioners' narrow interpretation of the regulations fails to recognize that the Supreme Court has consistently taken a wider view as to capital expenditures. See, e.g., Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345 (1971) (contributions to depository reserve fund were capital expenditures); Helvering v. Winmill, 305 U.S. 79 (1938) (taxpayer
(continued...)

with petitioners when they draw factual distinctions between the two cases sufficient to warrant contrary results.  The facts that ACC is not a securities dealer, that the installment contracts are not securities, and that none of the installment contracts expenditures are commissions are, in our minds, merely distinctions without a difference.  Compare Woodward v. Commissioner, 397 U.S. at 575, 577-578, wherein the Court stated:

> The Court recognized [in Helvering v. Winmill, supra,] that brokers' commissions are 'part of the (acquisition) cost of the securities,' Helvering v. Winmill, supra, 305 U.S. at 84, 59 S.Ct. at 47, and relied on the Treasury regulation, which had been approved by statutory re-enactment, to deny deductions for such commissions even to a taxpayer for whom they were a regular and recurring expense in his business of buying and selling securities.
>
> *    *    *    *    *    *    *
>
> in this case there can be no doubt that legal, accounting, and appraisal costs incurred by taxpayers in negotiating a purchase of the minority stock would have been capital expenditures.  See Atzingen-Whitehouse Dairy, Inc. v. Commissioner, 36 T.C. 173 (1961).  Under whatever test might be applied, such expenses would have clearly been 'part of the acquisition cost' of the stock.  Helvering v. Winmill, supra. * * *

Accord Commissioner v. Wiesler, 161 F.2d at 999 ("the Winmill case * * * follow[s] the well settled rule that expenditures incurred as an incident to the acquisition * * * of property are not ordinary and necessary business expenses, but are capital

---

[20](...continued) required to capitalize the regular and recurring costs incurred in acquiring securities).

expenditures"); <u>Ellis Banking Corp. v. Commissioner</u>, T.C. Memo. 1981-123 ("Nor would the fact that petitioner was engaged in the business of acquiring bank stock entitle it to deduct such expenditures if the bank stock was a capital asset and the expenditures were incurred in the acquisition thereof.  <u>Helvering v. Winmill</u>, <u>supra</u>.").

We also apply the case of <u>Commissioner v. Idaho Power Co.</u>, 418 U.S. 1 (1974), revg. 477 F.2d 688 (9th Cir. 1973), revg. T.C. Memo. 1970-83.  There, the taxpayer was a public utility engaged in the production, transmission, and sale of electricity. Throughout its long existence, the taxpayer regularly and routinely constructed additional transmission and distribution facilities using its own equipment and hundreds of its own employees.  Respondent determined that the taxpayer had to capitalize the depreciation on its equipment to the extent used in the construction project.  The Supreme Court agreed.  The Court noted that a goal of Federal income tax accounting is to match income with the related expenses and observed that "'It has long been recognized, as a general matter, that costs incurred in the acquisition * * * of a capital asset are to be treated as capital expenditures.'"  <u>Id.</u> at 12 (quoting <u>Woodward v. Commissioner</u>, <u>supra</u> at 575; ellipsis in original).  Further, the Court noted: "there can be little question that other construction-related expense items, such as tools, materials, and

wages paid construction workers, are to be treated as part of the cost of acquisition of a capital asset." Id. at 13. The Court concluded that requiring the taxpayer to capitalize its depreciation would maintain tax parity between it and another taxpayer who retained an independent contractor to construct the improvements and additions for it. In the latter case, the Court stated, the depreciation on the equipment used by the independent contractor would be part of the cost that the contractor charged on the project. The Court believed it unfair to allow a taxpayer to deduct the cost of constructing its facility if it has sufficient resources to do its own construction work, while requiring another taxpayer without such resources to capitalize its cost including the depreciation charged by the contractor.[21] See id. at 14. The Court expressed no opinion as to the fact that the taxpayer in the Idaho Power Co. case had been regularly and routinely improving its facilities throughout most of its long existence, nor that these improvements had for the most part been made by its employees. See id.; see also the opinions of the lower courts at Idaho Power Co. v. Commissioner, 477 F.2d 688, 690 (9th Cir. 1973); Idaho Power Co. v. Commissioner, T.C. Memo. 1970-83.

---

[21] The amicus for FHLMC would limit the Supreme Court's tax parity rationale to cases of self-created assets. We read nothing that would so limit that rationale.

The Court of Appeals for the Eleventh Circuit also applied the case of Commissioner v. Idaho Power Co., supra, in Ellis Banking Corp. v. Commissioner, 688 F.2d 1376 (11th Cir. 1982), to require capitalization of certain acquisition-related expenditures. There, the taxpayer was a bank holding company that, under State law, had to acquire the stock of other banks or organize new banks in order to expand its business into new geographic markets. The taxpayer agreed with another bank (Parkway) and certain of Parkway's shareholders to acquire all of Parkway's stock in exchange for taxpayer stock. The agreement was contingent on the satisfaction of certain events. Prior to consummation of the acquisition, but in connection therewith, the taxpayer incurred various expenses conducting a due diligence examination of Parkway's books. These expenses were for office supplies, filing fees, travel expenses, and accounting fees. The taxpayer deducted these expenses, and respondent disallowed the deduction. Respondent determined that the expenses had to be capitalized.

We sustained respondent's disallowance. We held that the expenses were capital expenditures because they were incurred in connection with the acquisition of a capital asset. The Court of Appeals for the Eleventh Circuit agreed. The taxpayer had argued that the expenses were "ordinary and necessary" because they were incurred in connection with its decision to acquire the stock and

in evaluating the market in which Parkway was located.  See <u>id.</u>
at 1381.  The taxpayer noted that the expenses were incurred
before it was bound to buy Parkway's stock.  The Court of
Appeals, in rejecting the taxpayer's claim to current
deductibility, stated:

> Ellis also devotes a portion of its brief to arguing
> that it is in the business of promoting banks, so that
> the expenditures made in that business are deductible.
> It is not enough to establish that expenditures are
> incurred in carrying on a trade or business to qualify
> for a deduction under section 162--all of the
> requirements set out above [namely, the five
> requirements for deductibility set forth in
> <u>Commissioner v. Lincoln Sav. & Loan Association</u>, 403
> U.S. at 352-353,] must be fulfilled.  Indeed, if being
> in the business sufficed, Ellis would be able to deduct
> the purchase price of the Parkway stock. * * *  [<u>Id.</u> at
> 1381 n.10.]

The Court of Appeals went on to say that

> the expenses of investigating a capital investment are
> properly allocable to that investment and must
> therefore be capitalized.  That the decision to make
> the investment is not final at the time of the
> expenditure does not change the character of the
> investment; when a taxpayer abandons a project or fails
> to make an attempted investment, the preliminary
> expenditures that have been capitalized are then
> deductible as a loss under section 165.  * * *  As the
> First Circuit stated, '* * * expenditures made with the
> <u>contemplation</u> that they will result in the creation of
> a capital asset cannot be deducted as ordinary and
> necessary business expenses even though that
> expectation is subsequently frustrated or defeated.'
> <u>Union Mutual</u>, 570 F.2d at 392 (emphasis in original).
> Nor can the expenditures be deducted because the
> expectations might have been, but were not, frustrated.
> [<u>Id.</u> at 1382.]

Our opinion as to the salaries and benefits is further
supported by the cases of <u>Godfrey v. Commissioner</u>, 335 F.2d 82

(6th Cir. 1964), affg. T.C. Memo. 1963-1, and Stevens v. Commissioner, 388 F.2d 298 (6th Cir. 1968). Godfrey v. Commissioner, supra, concerned deductions that the taxpayer claimed as to a joint venture in two parcels of real estate known as the Goose Pond and Adams Packing properties. Before taking title to the Goose Pond property, the taxpayer and his associates caused a use survey to be conducted on the property in order to ascertain its best commercial use. They concluded from the survey that the upper part of the tract was best suited for an automobile dealership and that the lower portion could best be used for a shopping center. They acquired the property and then discovered that it lacked the zoning classification necessary to use it in the manner indicated by the survey. They retained attorneys to try to change the property's classification. Their attempt was unsuccessful. The taxpayer deducted his proportionate share of the cost of the survey and the attorney's fee. The taxpayer also deducted travel and living expenses that he had paid in connection with acquiring both the Goose Pond and Adams Packing properties.

We denied the deductions, holding that all of the expenditures were capital expenditures. We observed that the use survey "represented their first step in the contemplated development of the property; and its benefits were obviously expected to extend beyond the year in which the survey was made."

Godfrey v. Commissioner, T.C. Memo. 1963-1.  We observed that the attorney's fee was part of the cost of the development of a capital asset, in that it represented an unsuccessful attempt to have the Goose Pond property rezoned for certain commercial use. We observed that the travel and living expenses generally related to the acquisition and development of the property.

The Court of Appeals for the Sixth Circuit agreed with us that all of the expenditures were capital expenditures.  The court stated:

> The Tax Court found that the cost of the "use survey" was a capital expenditure.  The court said: "It represented their first step in the contemplated development of the property; and its benefits were obviously expected to extend beyond the year in which the survey was made."  The test of an ordinary business expense is whether it is of a recurring nature and its benefit is generally exhausted within a year.  An expenditure is of a capital nature "where it results in the taxpayer's acquisition or retention of a capital asset, or in the improvement or development of a capital asset in such a way that the benefit of the expenditure is enjoyed over a comparatively lengthy period of business operation."  Louisiana Land & Exploration Co. v. Commissioner, 7 T.C. 507, aff'd, 161 F.2d 842, C.A. 5 * * *.  The purpose of the use survey was to benefit the land in a permanent way so that the owners could derive income from it on the basis of its best use.  We agree with the Tax Court that this was properly a capital expenditure.

> We are of the opinion that the same reasoning is applicable to the expenditure for attorney's fee. Counsel for the * * * [taxpayer] concedes that if the effort had been successful the expenditure would not have been a deductible item.  We think there can be no distinction.  The purpose of the expenditure was to create a permanent benefit.  The fact that it created neither a permanent nor exhaustible benefit does not

change its character.  * * *  [Godfrey v. Commissioner, 335 F.2d at 85.[22]]

In Stevens v. Commissioner, 46 T.C. 492 (1966), the taxpayer and another individual (Woody) entered into various joint ventures each of which involved acquiring a race horse and sharing that horse's winnings or any proceeds from its sale. Woody paid the purchase price of each horse, and the taxpayer paid each horse's maintenance and training expenses.  We held that one-half of the otherwise deductible maintenance expenses were capital expenditures because they represented the taxpayer's cost of acquiring a one-half interest in the horses.  We stated:

> We agree with respondent to the extent that at least some portion of these expenses, which would otherwise be deductible as ordinary and necessary business expenses, must be capitalized as petitioner's acquisition costs in the particular factual circumstances here present.  It is obvious that petitioner had some acquisition cost for his interests; these interests were not acquired for nothing. Although Woody paid the entire purchase price for each horse, he did not give petitioner a one-half interest in each without consideration. * * *
>
> *   *   *   *   *   *   *
>
> In effect, Woody assumed petitioner's half of the purchase price and as consideration for this, petitioner assumed Woody's half of the expense burden. * * *  [Id. at 497.]

---

[22] The court held that our findings as to the remaining expenses were not clearly erroneous.  See Godfrey v. Commissioner, 335 F.2d 82, 86 (6th Cir. 1964), affg. T.C. Memo. 1963-1.

In affirming our decision, the Court of Appeals for the Sixth Circuit held that the mere fact that the expenses were recurring and otherwise deductible business expenses was not enough to make the expenses deductible under section 162.  The court noted that "Section 162 was primarily intended to cover recurring expenditures where the benefit derived from the payment is realized and exhausted within the taxable year" and that the benefit from the expenses would not be exhausted within the year. Stevens v. Commissioner, 388 F.2d at 300; accord Perlmutter v. Commissioner, 44 T.C. at 403-405 (taxpayer required to capitalize portion of salaries, utilities, insurance, depreciation, legal and audit expenses, office expenses, and vehicle and truck expenses allocable to the construction of shopping center buildings).

We also are mindful of Wells Fargo & Co. & Subs. v. Commissioner, 224 F.3d 874 (8th Cir. 2000), affg. in part and revg. in part Norwest Corp. v. Commissioner, 112 T.C. 89 (1999). There, a bank (Davenport) entered into a transaction with another bank (Norwest) that resulted in Norwest's owning all the stock of an entity of which Davenport was a part.  Following the taxpayer's concession that section 263(a) required that Davenport capitalize the costs which were directly related to the transaction, we were left to decide whether section 162(a) allowed Davenport to deduct investigatory costs of $87,570, due

diligence costs of $23,700, and officers' salaries of $150,000 which respondent had determined were attributable to the transaction. Most ($83,450) of the investigatory costs related to services rendered by a law firm, before Davenport agreed to participate in the transaction. The remaining ($4,120) investigatory costs related to services performed by the law firm in investigating whether, after the transaction, Norwest's director and officer liability coverage would protect Davenport's directors and officers for acts and omissions occurring before the transaction. The due diligence costs related to services performed by the law firm in connection with Norwest's due diligence review. The disallowed officers' salaries were attributable to services performed in the transaction.

We held that section 162(a) did not let Davenport deduct any of the disputed costs. Our holding followed our conclusion that all of the costs bore a sufficient nexus to a transaction producing a significant long-term benefit to fall within the rules of capitalization as set forth primarily in INDOPCO, Inc. v. Commissioner, 503 U.S. 79 (1992). Upon appeal, the Commissioner conceded that section 162(a) allowed Davenport to deduct the investigatory costs of $83,450 because they were attributable to the investigatory stage of the transaction. That concession followed the Commissioner's release of Rev. Rul. 99-23, 1999-1 C.B. 998, 1000, which holds that

Expenditures incurred in the course of a general search for, or investigation of, an active trade or business in order to determine <u>whether</u> to enter a new business and <u>which</u> new business to enter (other than costs incurred to acquire capital assets that are used in the search or investigation) qualify as investigatory costs that are eligible for amortization as start-up expenditures under § 195. However, expenditures incurred in the attempt to acquire a specific business do not qualify as start-up expenditures because they are acquisition costs under § 263. The nature of the cost must be analyzed based on all the facts and circumstances of the transaction to determine whether it is an investigatory cost incurred to facilitate the <u>whether</u> and <u>which</u> decisions, or an acquisition cost incurred to facilitate consummation of an acquisition.[23]

As to the remaining fees of $27,820 ($4,120 + $23,700), all of which were incurred after Davenport had made its final decision as to the acquisition, the Court of Appeals for the Eighth Circuit agreed with us that those amounts were capital expenditures. The Court of Appeals disagreed with us, however, as to the officers' salaries and held that those costs were currently deductible. The court reasoned:

---

[23] The Commissioner's position as to the deductibility of investigatory expenditures incurred to acquire specific assets is set forth in Rev. Rul. 74-104, 1974-1 C.B. 70. There, the costs were "evaluation" expenditures which the taxpayer incurred in its business of acquiring residential property to renovate and sell to the public. Before acquiring the property, the taxpayer evaluated certain localities to ascertain the feasibility of selling the property in that locality. The taxpayer incurred a cost to secure an initial report from an independent agent and other costs to evaluate the report and the locality involved. The ruling holds that the costs are capital expenditures because they were incurred in connection with acquiring the residential property and provide benefits beyond the current taxable year through the sale of the renovated property.

the distinction between the case at hand, and the INDOPCO case lies in the relationship between the expense at issue and the long term benefit. In INDOPCO, the expenses in question were directly related to the transaction which produced the long term benefit. Accordingly, the expenses had to be capitalized. See INDOPCO, 503 U.S. 79, 112 S.Ct. 1039, 117 L.Ed.2d 226. We conclude that if the expense is directly related to the capital transaction (and therefor, the long term benefit), then it should be capitalized. * * * See e.g. INDOPCO, 503 U.S. 79, 112 S.Ct. 1039, 117 L.Ed.2d 226 (1992). In this case, there is only an indirect relation between the salaries (which originate from the employment relationship) and the acquisition (which provides the long term benefit * * *).

Similarly, the instant case is distinguishable from Acer Realty Co. v. Commissioner[22], wherein this Court held that the salaries paid to two officers for "unusual, nonrecurrent services" had to be capitalized. 132 F.2d 512, 513 (8th Cir. 1942). The taxpayer was a corporation whose only business was leasing real estate to a related corporation. Its officers were paid no salaries prior to their undertaking a large building program, at which point the two officers began acting as general contractors and "performed all the services necessary to the management of the construction of the buildings." Acer Realty, 132 F.2d at 514. Because the salaries were clearly and directly related to the capital project, this Court determined that most of the salaries paid were extraordinary or incremental expenses which had to be capitalized. Acer Realty Co. v. Commissioner, 132 F.2d 512 (8th Cir. 1942).

[22]Acer Realty is the only case in our Circuit, that we are aware of, which denies the taxpayer a deduction for salary expenses.

The instant case is easily distinguishable from Acer Realty because Davenport's officers had always received salaries, even before the acquisition was a possibility. There was no increase in their salaries attributable to the acquisition, and they would have been paid the salaries whether or not the acquisition took place. Therefore, we determine that the salary expenses in this case originated from the employment relationship between the taxpayer and its officers.

Indirectly, the payment of these salaries provided Davenport with a long term benefit. [<u>Wells Fargo & Co. & Subs. v. Commissioner</u>, 224 F.3d at 887-888.]

Judge Bright wrote a concurring opinion in <u>Wells Fargo & Co. & Subs.</u> to highlight the fact that the record did not allow for a determination as to the portion of the salaries which were directly related to the transaction. Judge Bright wrote:

> I write separately to emphasize that the record in this case is inadequate to show that the portion of the salaries in question, $150,000, was directly or substantially related to the acquisition. Moreover, the tax court's findings of fact on this issue does not address the direct or indirect relationship of the work of the officers to the acquisition. That finding recited:
>
>> During 1991, DBTC [Davenport] had 9 executives and 73 other officers (collectively, the officers). John Figge, James Figge, Thomas Figge, and Richard Horst worked on various aspects of the transaction, as did other officers. None of the offices were hired specifically to render services on the transaction; all were hired to conduct DBTC's day-to-day banking business. DBTC's participation in the transaction had no effect on the salaries paid to its officers. Of the salaries paid to the officers in 1991, $150,000 was attributable to services performed in the transaction. DBTC deducted the salaries, including the $150,000, on its 1991 Federal income tax return. Respondent disallowed the $150,000 deduction; i.e., the portion attributable to the transaction. * * *
>
> This finding does not address whether some officers at any particular period of time devoted substantial work to the acquisition or whether the officers during the period of time in question only incidentally worked on the acquisition while doing regular banking duties.

In order to determine whether an allocation of officers' salaries to an acquisition-transaction such as made here qualifies as a deduction from income or should be capitalized, the taxing authorities should require the taxpayer to show officers' time devoted to the acquisition as compared to time spent on regular work during a particular and relevant time period. The finding made by the tax court here does not justify capitalization of the officers' salaries. [Id. at 889-890 (Bright, J., concurring).]

We do not believe that our view as to the salaries and wages at hand is inconsistent with the Court of Appeals for the Eighth Circuit's view as to the salaries at issue in Wells Fargo & Co. & Subs., supra. The cases are factually distinguishable. There, some of Davenport's 82 officers spent a portion of their time performing services on a capital transaction; apparently, it was a relatively small portion, since the total salary attributable to work performed on the transaction by all of the officers was $150,000. The services which they performed as to the capital transaction were extraordinary in the daily course of their employment, and the capital transaction was extraordinary to their employer's business. They would have been paid the same salaries regardless of whether the transaction was consummated.

Here, by contrast, each of the disputed employees spent a significant portion of his or her time (in fact, in 8 of the 15 cases, all of his or her time) working on capital asset acquisitions which occurred in the ordinary course of ACC's

business.[24]  The employees were paid specifically to perform work as to the acquisitions, and the amount of the compensation that ACC paid to the employees hinged directly on the number of installment contracts that it acquired, e.g., at least some of the employees were entitled to receive a bonus in profitable years.[25]  Thus, whereas the officers in Wells Fargo & Co. & Subs., supra, performed the typical services of bank employees, services which could include work on a capital transaction as part of the bank's business in general, ACC's employees were hired and paid to perform services that necessarily would include work on capital asset acquisitions.

The record here indicates specifically the portion of ACC's total compensation that was directly related to ACC's acquisition of the installment contracts, and, in accordance with Supreme Court precedent (as well as jurisprudence from the Second Circuit, Fifth Circuit, and this Court), we consider as capital expenditures that "proportion of the wages and salaries of employees who spend some of their working hours laboring on the acquisition".  Briarcliff Candy Corp. v. Commissioner, 475 F.2d at 781; see Commissioner v. Idaho Power Co., 418 U.S. at 13; see

_____

[24] Of the total compensation paid to the disputed employees in 1993 and 1994, 76 percent ($213,028/$280,222) and 65.4 percent ($273,212/$418,065), respectively, was attributable to the acquisition of installment contracts.

[25] We also bear in mind the statement in ACC's PPM discussed supra note 13.

also <u>Cagle v. Commissioner</u>, 539 F.2d at 416; <u>Perlmutter v.
Commissioner</u>, 44 T.C. at 404.

Petitioners are mistaken when they assert that established
jurisprudence provides that section 162(a) always allows a
taxpayer to deduct the everyday, recurring costs of its business.
The primary cases upon which petitioners rely, i.e., the credit
card cases, did not merely rest on facts that the costs at issue
there were everyday and recurring in nature.  All of those cases
involved costs which were incurred in the businesses' startup
phase and which did not produce any separate or distinct asset.
In <u>Colorado Springs Natl. Bank v. United States</u>, 505 F.2d at
1192, for example, the Court of Appeals for the Tenth Circuit
noted that "The start-up expenditures here challenged did not
create a property interest.  They produced nothing corporeal or
salable."  Similarly, in <u>First Natl. Bank of South Carolina v.
United States</u>, 558 F.2d at 723, the Court of Appeals for the
Fourth Circuit noted that "Membership in ASBA is not a separate
and distinct additional asset created or enhanced by the payments
in question."  Likewise, in <u>Iowa-Des Moines Natl. Bank v.
Commissioner</u>, 68 T.C. at 879, we noted that the costs "did not
create or enhance a separate and distinct asset or property
interest."[26]  Cf. <u>Central Tex. Sav. & Loan Association v. United</u>

---

[26] In <u>First Security Bank of Idaho, N.A. v. Commissioner</u>,
592 F.2d 1050 (9th Cir. 1979), affg. 63 T.C. 644 (1975), the
(continued...)

States, 731 F.2d at 1184-1185 (court distinguished the credit card cases by virtue of the fact that the expense of the taxpayer before it created a separate and distinct asset). Contrary to petitioners' assertion (and, as discussed infra, the view of the Court of Appeals for the Third Circuit), we do not read any of the credit card cases to hold that everyday, recurring expenses are ipso facto deductible under section 162(a). In fact, as this Court observed in Iowa-Des Moines Natl. Bank v. Commissioner, 68 T.C. at 879, costs are entitled to deduction when they are "related to the active conduct of an existing business and * * * [do] not create or enhance a separate and distinct asset or property interest." Nor do we understand the Supreme Court in INDOPCO, Inc. v. Commissioner, 503 U.S. 79 (1992), to have espoused the sweeping pronouncement proffered by petitioners as to this issue.[27]

Petitioners also rely on PNC Bancorp, Inc., v. Commissioner, 212 F.3d 822 (3d Cir. 2000), revg. 110 T.C. 349 (1998). When this case was tried, the Court of Appeals for the Third Circuit had not yet released its opinion in that case, and petitioners

---

[26](...continued)
Court of Appeals for the Ninth Circuit adopted as the law of that circuit the decision of the Tenth Circuit in Colorado Springs Natl. Bank v. United States, 505 F.2d 1185 (10th Cir. 1974).

[27] Nor do we read Bankers Dairy Credit Corp. v. Commissioner, 26 B.T.A. 886 (1932), to hold that salaries and benefits are ipso facto deductible when they are recurring costs.

took the view that our opinion there was inapplicable to this case because, they claimed, the cases were factually distinguishable. We held in PNC Bancorp, Inc., v. Commissioner, supra, that loan origination costs were capital expenditures. The Court of Appeals for the Third Circuit disagreed, holding that the costs were deductible expenses. Petitioners now assert that PNC Bancorp, Inc. is relevant to our inquiry.

We do not believe that PNC Bancorp, Inc. v. Commissioner, supra, is so factually distinguishable from the instant case to support contrary results. Although the cases are obviously distinguishable by virtue of the fact that PNC (as defined below) was a loan originator and ACC is a loan acquirer, we do not believe that this bare distinction is meaningful enough to support contrary results in the cases, especially given the Supreme Court's statements in Commissioner v. Idaho Power Co., supra at 12-13, to the effect that the creation of an asset is subject to the same set of capitalization rules as the acquisition of an asset. Given the additional fact that the Court of Appeals for the Third Circuit disagreed with our view as to the rules of capitalization applicable to the loan origination costs in PNC Bancorp, Inc., we believe it appropriate to reconsider our opinion there in light of the contrary view set forth by the Court of Appeals for the Third Circuit in reversing our decision. We have carefully done so, giving due regard to

the contrary view.  For the reasons set forth below, we continue to adhere to our view on the rules of capitalization as expressed in <u>PNC Bancorp, Inc.</u>, respectfully disagreeing with the contrary view expressed by the Court of Appeals for the Third Circuit.

PNC was the successor in interest to two banks (collectively, PNC) which had deducted expenditures paid to market, research, and originate loans to PNC's customers.  These expenditures included:  (1) Amounts paid to record security interests, (2) amounts paid to third parties for property reports, credit reports, and appraisals, and (3) an allocable portion of salaries and benefits paid to employees for evaluating a borrower's financial condition, evaluating guaranties, collateral, and other security arrangements, negotiating loan terms, preparing and processing loan documents, and closing loan transactions.  PNC capitalized and amortized these costs for financial accounting purposes but deducted them for Federal income tax purposes.  PNC argued that the costs were deductible for tax purposes because they (1) were recurring expenses in the banking business, (2) were integral to PNC's daily operation, and (3) provided PNC with only short-term benefits.

We found that PNC incurred the costs to create separate and distinct assets, i.e., the loans, and that the costs produced for PNC long-term benefits in the form of the interest to be received in later years.  The Court of Appeals for the Third Circuit

disagreed with both of these findings.  The Court of Appeals focused primarily on the everyday meaning of the word "ordinary" and, without any reference to Helvering v. Winmill, 305 U.S. 79 (1938), and with only a passing reference to Commissioner v. Idaho Power Co., 418 U.S. 1 (1974), which the Court of Appeals cited for the proposition that capitalization prevents the distortion of income in the case of depreciable property, concluded that the loan origination costs were ordinary business expenses for purposes of section 162(a) because the costs were normal and routine to the business of a bank.  See PNC Bancorp, Inc., v. Commissioner, 212 F.3d at 828-829, 834-835.  The court saw no meaningful distinction between PNC's loan origination costs and the costs incurred as "ordinary expenses" by banks in general.  The court stated that PNC's deduction of the loan origination costs would not distort its income because it incurred those costs regularly.  See id. at 834-835.

The Court of Appeals for the Third Circuit also stated that PNC's costs did not create any separate and distinct asset within the meaning of Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345 (1971).  Unlike the assets in Lincoln Sav. & Loan Association, which were not used by the taxpayer in its everyday business, PNC used its loans as part of its everyday business. The Court of Appeals distinguished the respective assets in the cases by this fact.  The Court of Appeals also distinguished

PNC's costs from the payments in <u>Lincoln Sav. & Loan Association</u> by noting that the payments in <u>Lincoln Sav. & Loan Association</u> had formed the corpus of the asset, whereas PNC's costs were not included in the principal of the loans. The Court of Appeals analogized PNC's costs to the expenditures at issue in the credit card cases, concluding that the costs were deductible under that line of cases. <u>PNC Bancorp, Inc., v. Commissioner</u>, 212 F.3d at 830-831.

We do not believe that the "normal and routine" nature of the expenses in question dictates their deductibility. As discussed above, payments made with a sufficiently direct connection to the acquisition, creation, or enhancement of a capital asset must be capitalized even when those payments are made in the course of the payee's regular business operations. See, e.g., <u>Woodward v. Commissioner</u>, 397 U.S. at 575, 577-578; <u>Helvering v. Winmill</u>, <u>supra</u>. Nor do we believe that any of the long line of cases addressing this acquisition-related capitalization requirement supports a conclusion that a payment is a capital expenditure only if it creates, enhances, or becomes part of an asset that is unrelated to the taxpayer's daily business. An expense that recurs in a taxpayer's business is a capital expenditure when it is incurred in direct connection with the acquisition, creation, or enhancement of a separate and distinct asset, or provides the taxpayer with a significant

future benefit.  See, e.g., INDOPCO, Inc. v. Commissioner, 503
U.S. 79 (1992); Commissioner v. Idaho Power Co., supra at 13;
Woodward v. Commissioner, supra; Helvering v. Winmill, supra; see
also Ellis Banking Corp. v. Commissioner, T.C. Memo. 1981-123
(citing Woodward v. Commissioner, supra) (fact that a taxpayer
"incurs expenditures * * * on a recurring basis does not ensure
their characterization as 'ordinary' if they are incurred in the
acquisition of a capital asset").  The mere fact that an expense
may have been deductible in the credit card cases (or any other
case for that matter) does not necessarily mean that the same
type of expense is ipso facto deductible in another setting such
as the one found in PNC Bancorp, Inc., v. Commissioner, 212 F.3d
822 (3d Cir. 2000).  See, e.g., Commissioner v. Idaho Power Co.,
supra at 13.

We also do not believe that the fact that PNC's loan
origination costs were recurring in nature means that PNC's
current deduction of them would allow for an appropriate matching
of income and expense.  See PNC Bancorp, Inc., v. Commissioner,
supra at 834-835.  The Supreme Court stated explicitly in
INDOPCO, Inc. v. Commissioner, supra at 84, that our Federal
income tax system endeavors to match expenses with the related
revenue in the taxable period for which the income is recognized.
The Court stated in Commissioner v. Idaho Power Co., supra at 16,
that "The purpose of section 263 is to reflect the basic

principle that a capital expenditure may not be deducted from current income.  It serves to prevent a taxpayer from utilizing currently a deduction properly attributable, through amortization, to later tax years when the capital asset becomes income producing."  The thrust of these statements, in our minds, is that an expenditure must be deducted in accordance with its own individual identity, regardless of the possible recurrence in the taxpayer's business of that type of expense.  A taxpayer's income will be distorted if the taxpayer currently deducts a recurring expense that should be capitalized and the amount of that expense fluctuates meaningfully between taxable years.  For example, when the amount of such an expenditure increases significantly from one year to the next, the deduction of the expenditure may result in the taxpayer's income being understated in the first year and overstated in the second, and the profits of the business may appear to be sinking, when in fact it is enjoying great success, or rising, when in fact it may be seriously diminished.  See Electric & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1332-1333 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974).  Such an inaccurate reporting of this fluctuation thwarts, rather than fosters, "a major objective of efficient tax policy."  Cabintaxi Corp. v. Commissioner, 63 F.3d 614, 619 (7th Cir. 1995), affg. in part, revg. in part, and remanding on another issue T.C. Memo. 1994-316.

Nor do we read anything in section 263 or the related regulations that hinges section 263(a)'s applicability to an expenditure on a finding that an asset acquired or created by the expenditure was used outside of the taxpayer's daily business. In fact, if such was the case, the costs incurred to acquire manufacturing equipment would arguably be deductible because that equipment is indispensable to the daily operation of the manufacturer's business. Moreover, in the case of an appraisal, the costs of which are clearly capital expenditures when incurred in connection with the purchase of property, the appraisal neither adds value to the appraised property nor has a long-term life. We also note our disagreement with the concept that a cost is a capital expenditure only if it becomes part of an asset. To be sure, the depreciation of the equipment used to construct the facilities in Commissioner v. Idaho Power Co., 418 U.S. 1 (1974), did not become an actual part of those facilities.

Nor do we find persuasive PNC's argument to the Court of Appeals for the Third Circuit that our application of the "separate and distinct asset test" of Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. at 354, was too expansive in that it would require capitalization of costs incurred "in connection with" or "with respect to" the acquisition of an asset. PNC Bancorp, Inc. v. Commissioner, 212 F.3d at 830. Such an argument conflicts directly not only with the Supreme Court's

reasoning in Commissioner v. Idaho Power Co., supra at 12-14, and Woodward v. Commissioner, 397 U.S. at 575-576, but with the reasoning of various Courts of Appeals that have required capitalization of amounts incurred "in connection with" the acquisition of an asset.  See, e.g., Johnsen v. Commissioner, 794 F.2d at 1162; Central Tex. Sav. & Loan Association v. United States, 731 F.2d at 1184; Ellis Banking Corp. v. Commissioner, 688 F.2d at 1379.

Nor do we believe that the fact an expenditure is somehow connected to the "needs of current income production" is enough to qualify that expenditure as a current deduction.  PNC Bancorp, Inc. v. Commissioner, 212 F.3d at 829, 833-834 (citing National Starch & Chem. Corp. v. Commissioner, 918 F.2d 426 (3d Cir. 1990), affd. sub nom. INDOPCO, Inc. v. Commissioner, 503 U.S. 79 (1992).  In our minds, an expenditure that produces both a current and long-term benefit is neither 100 percent deductible nor 100 percent capitalizable.  Instead, regardless of whether the expenditure's primary or predominant purpose is to benefit significantly the business' current operation, on the one hand, or its long-term operation, on the other hand, the expenditure is a capital expenditure to the extent that it produces a significant long-term benefit and deductible to the remaining extent.  See Woodward v. Commissioner, 397 U.S. at 577-579; Commissioner v. Idaho Power Co., supra; Great N. Ry. v.

Commissioner, 40 F.2d 372 (8th Cir. 1930), affg. on other grounds

8 B.T.A. 225 (1927); Southern Natural Gas Co. v. United States,

188 Ct. Cl. 302, 412 F.2d 1222, 1264-69 (1969).[28]

Having rejected petitioners' first argument as to the
salaries and benefits, we now turn to petitioners' second
argument that the salaries and benefits are outside the reach of
section 263 because, they contend, those items are not described
in that section.  Petitioners make three assertions in support of
this argument.  First, they assert that section 263(a) applies
only when an expenditure creates or adds value to a separate and
distinct capital asset[29] and that ACC's payment of the salaries
and benefits neither created nor added value to a capital asset.
According to petitioners, an expenditure is subject to section
263(a) only if it (1) is incurred to increase the value of

---

[28] In Commissioner v. Idaho Power Co., 418 U.S. 1 (1974),
the Supreme Court held that the taxpayer must capitalize the
portion of depreciation on transportation equipment allocable to
part-time use in constructing improvements and other capital
facilities for the taxpayer.  In Great N. Ry. v. Commissioner, 40
F.2d 372 (8th Cir. 1930), affg. on other grounds 8 B.T.A. 225
(1927), the Court of Appeals for the Eighth Circuit held that a
railway had to capitalize the cost of operating its regular
trains to the extent it was attributable to the transportation of
the railway's workmen and materials to construction sites.  In
Southern Natural Gas Co. v. United States, 188 Ct. Cl. 302, 412
F.2d 1222, 1264-69 (1969), the Court of Claims held that
depreciation on automotive equipment used primarily for operating
and maintaining a pipeline system, but occasionally used in
construction operations, had to be capitalized to the extent it
was attributable to the construction.

[29] The amici for FNMA also advance this argument.

property and (2) concerns the permanent improvement or betterment of that property.  Petitioners also contend that the installment contracts are ordinary (and not capital) assets in the hands of ACC.  Second, they assert that the salaries and benefits are expansion costs as to an existing business which, they contend, are deductible under a line of cases including PNC Bancorp, Inc., v. Commissioner, 212 F.3d 822 (3d Cir. 2000); Briarcliff Candy Corp. v. Commissioner, 475 F.2d at 781; Bankers Dairy Credit Corp. v. Commissioner, 26 B.T.A. 886 (1932); and the credit card cases.  Petitioners also point to the following excerpt from the legislative history under section 195:

> In the case of an existing business, eligible startup
> expenditures do not include deductible ordinary and
> necessary business expenses paid or incurred in
> connection with an expansion of the business.  As under
> present law, these expenses will continue to be
> currently deductible.  [H. Rept. 96-1278, at 11 (1980),
> 1980-2 C.B. 709, 712.]

Third, they assert that the salaries and benefits did not generate a future benefit to ACC.  They contend that the salaries and benefits are not directly related to the acquisition of any specific installment contract.  They contend that the salaries and benefits were predecisional expenses which generated predominately short-term benefit.  They contend that the salaries and benefits did not themselves generate future income but only allowed ACC to decide whether it would acquire an installment contract.

We reject petitioners' second argument.  As to their first assertion, we disagree with them that acquisition costs are capitalizable under section 263(a) only if they create or add value to a capital asset.[30]  In Dustin v. Commissioner, 467 F.2d 47, 49-50 (9th Cir. 1972), affg. 53 T.C. 491 (1969), the taxpayer was a shareholder of an S corporation (Capitol) that agreed to acquire the stock of a company that owned and operated radio station KGMS.  In 1961, Capitol incurred $12,460 of legal, engineering, and accounting fees in connection with the transfer to Capitol of control of station KGMS' radio-broadcasting license.  The taxpayer deducted his proportionate share of these expenses, and the Commissioner disallowed the deduction asserting that the expenses were capital expenditures.  The taxpayer argued in this Court that he could deduct $10,960 of the expenses because they were attributable to a hearing held by the Federal Communications Commission on this matter and which did not add any value to the acquired stock.  We disagreed with the taxpayer that any of these amounts were currently deductible.  On appeal, so did the Court of Appeals for the Ninth Circuit.  According to

---

[30] As mentioned above, we understand the term "capital asset" to be used in its accounting sense and not in accordance with its meaning under sec. 1221.  We add to our prior discussion that the term as applied to capitalization issues does not arise from the Code but is a byproduct of judicial interpretation.  On the basis of our understanding of the meaning of the term, we reject petitioners' contention that costs related to an "ordinary" asset under sec. 1221 can never be a capital expenditure.

that court: "The expenditures connected with the acquisition of the broadcast license were no less capital in character because they did not themselves contribute additional and specific financial value to the license being sought. The important fact is that the expenditures were made for the purpose of acquiring a capital asset." Dustin v. Commissioner, 467 F.2d at 50; accord King Amusement Co. v. Commissioner, 44 F.2d 709 (6th Cir. 1930) (fees paid to guarantors of rent under lease were capital expenditures notwithstanding the fact that the fees added no value to the lease or to the property leased thereunder), affg. 15 B.T.A. 566 (1929).

In making this assertion, petitioners focus solely on the latter part of the text in section 263(a)(1); to wit, the phrase "made to increase the value of any property". We do not do likewise. A proper reading of that section in full reveals that the phrase relates to "permanent improvements or betterments" and not to "new buildings".[31] Cf. Dustin v. Commissioner, 53 T.C. at 505. Here, we are dealing with salaries and benefits paid to acquire capital assets (i.e., the installment contracts) and not with expenditures made to improve or better property already owned. We also bear in mind that the test for capitalization

---

[31] Under the Treasury Department's longstanding interpretation of sec. 263(a) as set forth in sec. 1.263(a)-2(a), Income Tax Regs., the cost of acquiring a long-term asset is an example of a capital expenditure.

does not hinge on the amount of value added to property but looks at the nature of the expense itself.  See <u>Dominion Resources Inc.</u> <u>v. United States</u>, 219 F.3d 359, 371 (4th Cir. 2000).  When the nature of an expenditure bears a direct relation to the acquisition of a capital asset, such as is the case here, the expenditure must be capitalized.

The amicus for FNMA expands on petitioners' first assertion by reference to section 1.263(a)-1(b), Income Tax Regs.  That section provides:  "In general, the amounts referred to in paragraph (a) of this section include amounts paid or incurred (1) to add to the value, or substantially prolong the useful life, of property owned by the taxpayer * * * or (2) to adapt property to a new or different use."  The amicus also references the following passage from this Court's Memorandum Opinion in <u>Mayer v. Commissioner</u>, T.C. Memo. 1994-209:  "It appears from the record that these transaction fees consisted in large part of general overhead rather than costs specifically allocable to individual purchases and sales.  These expenses are not capitalizable under section 263."[32]  The amicus for FNMA concludes that the salaries and benefits are indirect costs outside the realm of section 263(a).

---

[32] This passage is likewise referenced by the amicus for FHLMC.

We disagree with the additional arguments set forth by the amicus for FNMA as to petitioners' first assertion. The rule of section 1.263(a)-1(b), Income Tax Regs., upon which the amicus relies is merely a general rule that is not intended to contain the sole parameters of capitalization under section 263(a). Nor do the amici rely correctly on our Memorandum Opinion in Mayer v. Commissioner, supra. There, the taxpayer was an individual who argued that he could capitalize his investment-related expenses. We held he could not because he failed to meet his burden of proof.

Nor are we persuaded by petitioners' second assertion that a body of law treats the salaries and benefits as deductible expansion costs. As to the body of cases relied upon by petitioners, we have discussed at length our disagreement with their reading of these cases and adhere to our belief that none of the cases supports the result that they desire. Nor does the record at hand persuade us that any of the salaries and benefits were incurred in expansion of ACC's business.[33] Even if they could be construed to be expansion costs, which as just mentioned we do not find that they are, petitioners would still not prevail. Simply because a cost may qualify as an expansion cost

---

[33] In fact, petitioners' assertion that the costs were related to an expansion of ACC's business is inconsistent with their primary argument that the expenditures were incurred routinely in ACC's everyday business.

does not make it a deductible expense.  See, e.g., <u>FMR Corp. &</u> <u>Subs. v. Commissioner</u>, 110 T.C. 402, 429 (1998) (section 195 does not require "that <u>every</u> expenditure incurred in <u>any</u> business expansion is to be currently deductible".[34]  Such is especially true here where the salaries and benefits were incurred in connection with the acquisition of a capital asset.

We also are unpersuaded by petitioners' third assertion that the salaries and benefits did not generate a significant future benefit to ACC.  These costs contributed directly to ACC's receipt in later years of interest and excess principal income.  This income significantly benefitted ACC in that it was the bread and butter of its operation.  Because ACC's payment to its employees of the disputed salaries and benefits provided ACC with such a significant long-term benefit, they are capital expenditures.  See <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79 (1992); see also <u>Commissioner v. Idaho Power Co.</u>, 418 U.S. 1 (1974); <u>Woodward v. Commissioner</u>, 397 U.S. 572 (1970); <u>United States v. Hilton Hotels Corp.</u>, 397 U.S. 580 (1970); cf. <u>Colonial Am. Life Ins. Co. v. Commissioner</u>, 491 U.S. 244, 251 n.5 (1989) ("the important point is * * * whether the taxpayer is investing in an asset or economic interest with an income-producing life that extends substantially beyond the taxable year").

---

[34] Nor is a cost deductible merely because it preceded the final decision as to the acquisition of a specific asset.

The amicus for FNMA concludes as to the salaries and benefits that capitalizing these costs will administratively burden ACC. We disagree. It was ACC that identified these costs for its auditors in order to capitalize the costs for financial accounting purposes. Contrary to the amicus' assertion, under the facts of this case, it is not "impossible" to identify the portion of the salaries and benefits which are attributable to each installment contract.[35]

We now turn to the PPM-related expenditures. Respondent determined and argues that ACC must capitalize these expenditures. Respondent points to the fact that the repayment of the Notes extended beyond the year of their issuance. Petitioners maintain that the PPM expenditures are currently deductible. Petitioners repeat many of the same arguments which we have rejected as to the salaries and benefits, stressing their assertion that ACC issued the Notes in order to obtain funds to acquire installment contracts in the ordinary course of its business. Petitioners also add, with citations to Bonded Mortgage Co. v. Commissioner, 70 F.2d 341 (4th Cir. 1934), revg. and remanding 27 B.T.A. 965 (1933), and Franklin Title & Trust Co. v. Commissioner, 32 B.T.A. 266 (1935), that financing

---

[35] The amicus also raises an issue as to whether ACC's income was reflected clearly, within the meaning of sec. 446(b), by its deduction of the salaries and benefits. This issue was not raised by the parties and is not before the Court. We decline the amicus' invitation to address it.

companies such as ACC may currently expense commissions connected to the issuance of long-term debt.

We agree with respondent that the PPM expenditures are capital expenditures.[36] As to each of petitioners' arguments which we rejected above, we also reject them here as applied to the PPM expenditures for the reasons stated above. As to petitioners' additional argument, we reject that argument as well. The fact that ACC incurred the PPM expenditures in borrowing funds means that the expenditures are capital expenditures and must be amortized over the life of the debt. See, e.g., Austin Co. v. Commissioner, 71 T.C. 955, 964-965 (1979); Enoch v. Commissioner, 57 T.C. 781, 794 (1972); Longview Hilton Hotel Co. v. Commissioner, 9 T.C. 180, 182-183 (1947); Lovejoy v. Commissioner, 18 B.T.A. 1179, 1181-1183 (1930); see also S. & L. Bldg. Corp. v. Commissioner, 19 B.T.A. 788, 795-796 (1930), revd. on other grounds 60 F.2d 719 (2d Cir. 1932), revd. sub nom. Burnet v. S. & L. Bldg. Corp., 288 U.S. 406 (1933); compare Anover Realty Corp. v. Commissioner, 33 T.C. 671, 675 (1960), wherein we stated:

> It is not the purpose for which the loan is made that is important. It is the purpose of the expenditure for loan discounts and expenses. That

---

[36] In contrast with respondent, however, we allow ACC to deduct for 1994, under sec. 165(a), the portion of those expenditures that was attributable to the offering that was abandoned in that year. See Ellis Banking Corp. v. Commissioner, 688 F.2d at 1382.

purpose is to obtain financing or the use of money over a fixed period extending beyond the year of borrowing. When we analyze the reason behind the rule of amortizing such debt expenses, the distinction between this case and <u>S. & L. Building Corporation</u> and <u>Longview Hilton Hotel Co.</u> vanishes. Here, as in the cited cases, the mortgage discounts and expenses represent the cost of money borrowed for a period extending beyond the year of borrowing. It matters not that the proceeds of the loans be used to build an income--producing warehouse as in <u>Julia Stow Lovejoy</u>, or "to purchase additional properties" as in <u>S. & L. Building Corporation</u> or to buy the mortgaged premises, as in the instant case. In all such cases the expenditure represents an expenditure for the cost of the use of money and not a capital expenditure for the cost of any asset obtained by the use of the proceeds of the money borrowed.

As to the two cases upon which petitioners rely to support their additional argument, those cases are factually distinguishable from the case at hand and require no further discussion.

We have considered each of the arguments made by the parties and by the amici. We have rejected all arguments not discussed herein as meritless.

<u>Decisions will be entered under Rule 155</u>.

Reviewed by the Court.

WELLS, CHABOT, COHEN, GERBER, COLVIN, VASQUEZ, and THORNTON, <u>JJ</u>., agree with this majority opinion.

CHIECHI, <u>J</u>., did not participate in the consideration of this opinion.

SWIFT, J., concurring:  Although I would go further than the majority and allow all of the salaries and overhead included in the so-called installment contract expenditures to be currently deductible, I do not dissent because I largely agree with the result reached by the majority and with the movement reflected therein away from the approach that would capitalize otherwise routine business expenses.

In PNC Bancorp, Inc. v. Commissioner, 110 T.C. 349, 370 (1998), revd. 212 F.3d 822 (3d Cir. 2000), a case involving the treatment of salary expenses very similar to those involved herein (namely, salary expenses of credit institutions whose officers and employees, among other things, investigate the creditworthiness of potential borrowers), we concluded that a portion of the salary expenses should be "assimilated" into the capital costs of the loans that were approved.

The Court of Appeals for the Third Circuit disagreed and held that the salaries and other expenses reflected "recurring, routine day-to-day business" activities that did not produce significant future benefits and therefore that the expenses were currently deductible.  PNC Bancorp, Inc. v. Commissioner, 212 F.3d at 834.  The Court of Appeals resolved not to expand the type of expenses that must be capitalized "so as to drastically limit what might be considered as 'ordinary and necessary' expenses."  Id. at 830.

I believe the facts noted below reflect the noncapital, ordinary and necessary nature of all of the salary and overhead expenses that are in issue herein and should control resolution of this fact issue.

(1) The salaries ACC paid were routine, reasonable and recurring, and the amounts thereof, including increases and bonuses thereto, were tied to overall net company profits, not to the acquisition of specific installment loans.  As the Supreme Court explained:

> Of course, reasonable wages [salaries] paid
> in the carrying on of a trade or business
> qualify as a deduction from gross income.
> * * *  [Commissioner v. Idaho Power Co., 418
> U.S. 1, 13 (1974);  emphasis added.]

(2) Generally, and for the most part, the specific benefits initially received by ACC from the services of its employees investigating proposed installment loans (namely, the receipt of information needed to review the creditworthiness of potential debtors on the installment loans) were exhausted or lost by ACC almost simultaneously with the receipt of the benefits (i.e., for various reasons the large majority of the proposed installment loans that were investigated and considered by ACC were abandoned within a day (majority op. p. 9)).  In my opinion, this fact

reflects strongly on the ordinary, noncapital nature of all of ACC's related salary and overhead expenses and rebuts the appropriateness of some complicated and rather arbitrary adjustment under which a portion of the expenses would be capitalized.

As stated by the Court of Appeals for the Sixth Circuit in Godfrey v. Commissioner, 335 F.2d 82, 85 (6th Cir. 1964), the appellate venue for these cases:

> The test of an ordinary business expense is whether it is of a recurring nature and its benefit is generally exhausted within a year. * * * [Emphasis added.]

Generally, the benefits ACC received were exhausted within a few hours after a majority of the prospective installment loans were investigated and considered.

Under section 1.263(a)-2(a), Income Tax Regs., expenses are to be capitalized where they produce benefits to a taxpayer with a life substantially beyond a year. Computing the average life of all of the installment loans investigated and considered by ACC's employees (including the loan applications rejected or withdrawn as well as those approved) produces an average life for

all of the installment loans investigated and considered of 6.6 months for 1993 and 7.4 months for 1994.[1]  Because a majority of the installment loans investigated and considered by ACC were never purchased and because the average life of all of the installment loans (factoring in all installment loans investigated and considered) was not beyond one year, I believe it would be erroneous to conclude generally that the allegedly related salaries and overhead provided benefits to ACC with a life "substantially beyond" one year.

(3) The salaries and overhead were not paid by ACC in connection with any specific installment loans.  Note the Supreme Court's words, also from Commissioner v. Idaho Power Co., 418 U.S. at 13, linking expenditures to be capitalized to specific capital assets:

> But when wages [salaries] are paid in connection with
> the construction or acquisition of a capital asset,
> they must be capitalized and are then entitled to be

---

[1]  My computation of the average life of ACC's installment loans investigated and considered (including in the "Total" loans those installment loans rejected or withdrawn) is shown below:

| | Number of Installment Loans | | | | |
|---|---|---|---|---|---|
| Year | Rejected or Withdrawn | Accepted | Total | Average Duration of Accepted Loans | Average Duration of All Loans* |
| 1993 | 1,131 | 693 | 1,824 | 17.5 months | 6.6 months |
| 1994 | 1,338 | 820 | 2,158 | 19.5 months | 7.4 months |

\* For 1993 [(1,131 ✕ 0) ✛ (693 ✕ 17.5)] ÷ 1,824 = 6.6.

  For 1994 [(1,338 ✕ 0) ✛ (820 ✕ 19.5)] ÷ 2,158 = 7.4.

> amortized over the life of <u>the</u> capital asset so acquired. * * * [Emphasis added.]

The point is not whether there is only one capital asset or many capital assets to which expenses may be attached and capitalized. Rather, the point is that to require capitalization of what are otherwise routine and recurring ordinary and necessary expenses, the expenses must be directly linked and associated with very specific and identifiable capital assets.

(4) Services relating to ACC's credit investigations that were performed by ACC employees simply constituted investigatory activities and as such the related salaries and overhead expenses should be currently deductible. See <u>Wells Fargo & Co. & Subs. v. Commissioner</u>, 224 F.3d 874, 887-888 (8th Cir. 2000), affg. in part and revg. in part <u>Norwest Corp. & Subs. v. Commissioner</u>, 112 T.C. 89 (1999).

(5) Quite contrary to a possible reading of the majority opinion (see Ruwe, J., concurring op. p.79), ACC's primary and underlying business activity is not the "purchase" of installment loans. Rather, it is the "holding" of those loans and the associated provision of funds to debtors and the credit intermediation relating thereto (and all that is encompassed within credit intermediation) that ACC provides that constitute ACC's primary, dominant, and underlying business activity.

Presumably, the amount of ACC's income and profit in any one year relates primarily to its annual cost of funds and to the

losses associated with delinquent loan repayments, on the one hand, as compared to the interest income ACC receives each year on the installment loans, on the other hand. For Federal income tax matching purposes, those expenses and income would appear to be matched fully and completely on ACC's annual Federal income tax returns, as filed. To now require capitalization, as respondent would, of a portion of ACC's regular and routine salary and overhead expenses, on the ground that they somehow relate directly to the acquisition of specific installment loans would, in my opinion, reflect a misunderstanding of the true nature (1) of ACC's underlying business activity, (2) of ACC's costs and expenses, and (3) of ACC's income and profit.

As the majority opinion states (majority op. p. 4), ACC was formed "to provide alternate financing". ACC's credit investigations and its credit risk decisions relating thereto represent just one of the steps (and certainly not the dominant step) in ACC's business of credit intermediation (i.e., of providing "financing").[2]

---

[2] I acknowledge that the majority opinion (majority op. p. 4) is less than clear in its statement of the business purpose of ACC. Nevertheless, the majority does acknowledge the important role of ACC in providing "financing", which in my opinion and experience involves much more than just investigating loan applicants and approving or rejecting the applications.

Although the majority would allow most of ACC's salary expenses in issue to be currently deductible, I would go further and hold all of such salaries to be currently deductible.

I also am puzzled by the majority's different treatment of salaries and overhead expenses. I believe that on the particular facts of this case both salaries and overhead expenses should receive consistent treatment and, as indicated, be fully deductible.

The concluding comments made by the Court of Appeals for the Third Circuit in PNC Bancorp, Inc. v. Commissioner, 212 F.3d at 835, reflect much of my thinking on the issue before us. I quote a portion thereof:

> we find the case before us today to be much farther
> from the heartland of the traditional capital
> expenditure (a "permanent improvement or betterment")
> than are the scenarios at issue in INDOPCO and Lincoln
> Savings. We will not mechanistically apply phrases
> from those precedents in ignorance of the realities of
> the facts before us. We see no principled distinction
> between the costs at issue here and other costs
> incurred as "ordinary expenses" by banks. [Id.]

RUWE, J., concurring in part and dissenting in part:  I agree with the majority's legal analysis and its application of that analysis to ACC's expenditures for salaries and benefits (hereinafter "salaries") that were incurred in connection with the acquisition of installment contracts.  The majority correctly holds that the percentage of salaries related to credit analysis activities must be capitalized.  However, the majority then holds that "overhead" expenditures need not be capitalized.  I disagree with the majority's conclusion that the "overhead" expenses were not directly related to the acquisition of installment contracts because, in my opinion, that conclusion is inconsistent with the majority's specific findings of fact.

The following breakdown of specific expenditures appears on page 11 of the majority's findings of fact:

### Breakdown of Specific Expenditures

1993

| Employee | Salary And Wages | Benefits FICA | Benefits MESC/FUTA | Benefits BC/BS | Total Expense | Percentage of Total Expenses Related to ACC's Credit Analysis Activities | Amount In Issue |
|---|---|---|---|---|---|---|---|
| Steve Balan | $69,359 | $4,504 | $313 | $4,062 | $78,238 | 50 | $39,119 |
| James Blasius | 89,769 | 4,713 | 313 | 4,062 | 98,857 | 75 | 74,143 |
| Cass Budzynowski | 43,500 | 3,213 | 313 | 1,790 | 48,816 | 100 | 48,816 |
| Hope McGee | 16,248 | 1,216 | 313 | 3,692 | 21,469 | 100 | 21,469 |
| Kelly | 16,100 | 1,193 | 313 | 1,790 | 19,396 | 100 | 19,396 |
| Stacey | 10,280 | 767 | 313 | 2,086 | 13,446 | 75 | 10,085 |
|  | 245,256 | 15,606 | 1,878 | 17,482 | 280,222 |  | 213,028 |
| Overhead Items |  |  |  |  |  |  |  |
| Printing |  |  |  |  | 9,412 | 75 | 7,059 |
| Telephone |  |  |  |  | 12,454 | 75 | 9,341 |
| Computer |  |  |  |  | 19,598 | 95 | 18,618 |
| Rent |  |  |  |  | 34,413 | 50 | 17,207 |
| Utilities |  |  |  |  | 5,162 | 50 | 2,581 |
|  |  |  |  |  | 81,039 |  | 54,806 |
|  |  |  |  |  | 361,261 |  | 267,832 |

1994

| Employee | Salary, Wages, and Estimated Bonus | FICA | Benefits MESC/FUTA | BC/BS | Total Expense | Percentage of Total Expenses Related to ACC's Credit Analysis Activities | Amount In Issue |
|---|---|---|---|---|---|---|---|
| Steve Balan | $95,820 | $4,886 | $218 | $4,932 | $105,856 | 40 | $42,342 |
| James Blasius | 139,216 | 5,776 | 218 | 4,932 | 150,142 | 50 | 75,071 |
| Cass Budzynowski | 52,846 | 3,813 | 218 | 2,177 | 59,054 | 100 | 59,054 |
| Hope McGee | 11,508 | 842 | 218 | 4,932 | 17,500 | 100 | 17,500 |
| Kelly | 22,200 | 1,584 | 218 | 2,177 | 26,179 | 100 | 26,179 |
| Sue | 24,500 | 1,760 | 218 | 4,932 | 31,410 | 100 | 31,410 |
| Kathy | 16,921 | 1,256 | 218 | 4,932 | 23,327 | 75 | 17,495 |
| Stacey | 1,218 | 93 | 32 | 411 | 1,754 | 75 | 1,316 |
| Kirsten | 2,438 | 167 | 57 | 181 | 2,843 | 100 | 2,843 |
|  | 366,667 | 20,177 | 1,615 | 29,606 | 418,065 |  | 273,210 |

| Overhead Items |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
| Printing |  |  |  |  | 8,663 | 75 | 6,497 |
| Telephone |  |  |  |  | 15,133 | 60 | 9,080 |
| Computer |  |  |  |  | 25,919 | 95 | 24,623 |
| Rent |  |  |  |  | 37,875 | 60 | 22,725 |
| Utilities |  |  |  |  | 5,126 | 60 | 3,076 |
|  |  |  |  |  | 92,716 |  | 66,001 |
|  |  |  |  |  | 510,782 |  | 339,211 |

These expenditures were all incurred in ACC's business. The majority finds that ACC's only business operation was the acquisition of installment contracts and the servicing of those contracts.[1] With respect to the salaries and "overhead" expenses found to be related to ACC's credit analysis activities ($267,832 for 1993 and $339,211 for 1994),[2] the majority makes the following finding of fact:

> In 1993 and 1994, ACC paid installment contracts expenditures totaling $267,832 and $339,211, respectively, * * * which were attributable to ACC's obtaining of credit reports and screening of credit histories, related primarily to the portion of ACC's payroll and overhead expenses that was attributable to its credit analysis activities.[6] None of these

---

[1]The majority finds: "Its sole business operation is (1) the acquisition of installment contracts from automobile dealers * * * and (2) the servicing of those contracts." Majority op. pp. 4-5.

[2]The parties agree with the allocations in the above table.

> expenditures included any postacquisition or servicing
> expenses. * * *
> ⁶We use the term "credit analysis activities" to
> refer to ACC's credit review services and its funding
> services (i.e., ACC's issuance of the checks to dealers
> in consideration for the installment contracts).
> [Majority op. p. 10; emphasis added.]

From the majority's findings of fact I conclude: (1) ACC's business operation consisted of the acquisition of installment contracts and the postacquisition servicing of those contracts; and (2) of the total expenses for salaries and overhead for 1993 and 1994, $267,832 for 1993 and $339,211 for 1994 were related to credit analysis activities and were not related to any other business operations of ACC.[3] To me, the logical conclusion is that both salaries and overhead expenses, totaling $267,832 for 1993 and $339,211 for 1994, were exclusively for ACC's acquisition of installment contracts and thus were "directly" related to the acquisition of installment contracts.

The percentage of ACC's salaries and "overhead" expenses that related exclusively to ACC's credit analysis activities indicates that most of ACC's business activity concerned the acquisition of installment contracts. For example, 76 percent of salaries and 68 percent of "overhead" expenses for 1993 were related to ACC's credit analysis activities. For 1994, the

---

[3]The majority finds that "None of these expenditures included any postacquisition or servicing expenses." Majority op. p. 10. ACC's only business operation was the acquiring of installment contracts and the postacquisition servicing of those installment contracts.

percentages were 65 percent and 71 percent, respectively. The majority finds that "Each of the employees spent a significant portion of his or her time working on credit analysis activities * * * and, but for ACC's anticipated acquisition of installment contracts, ACC would not have incurred the salaries and benefits attributable to those activities." Majority op. pp. 27-28. Absent evidence to the contrary, it would seem to follow logically that if ACC's business operation had not included credit analysis activities, ACC would never have incurred the overhead expenses attributable to those activities.

The majority correctly states that the "overhead" expenses would be capital in nature if they "originated" in ACC's process of acquiring installment contracts. Majority op. p. 29. However, the majority reasons that the "overhead" expenses were not directly related to the acquisition of installment contracts because:

> None of these routine and recurring expenses originated
> in the process of ACC's acquisition of installment
> contracts, nor, in fact, in any anticipated acquisition
> at all. ACC would have continued to incur most of
> these expenses in the ordinary course of its business
> had its business only been to service the installment
> contracts. * * * [Id.]

There is nothing in the majority's specific findings of fact to support the conclusion that overhead expenses related to credit analysis activities did not "originate" in the process of ACC's

acquisition of installment contracts.[4]  Indeed, it would be logical to conclude that the type and amount of these "overhead" expenses did "originate" in ACC's acquisition of installment contracts.  After all, this activity was ACC's dominant activity.  If ACC had never engaged in acquiring installment contracts, most of its expenditures for both salaries and overhead expenses would have been unnecessary in the first place.

The majority reasons that rent and utilities were "generally fixed charges which had no meaningful relation to the number of credit applications analyzed (or the number of installment contracts acquired) by ACC."  Majority op. p. 29.  Again, with the possible exception of rent,[5] there are no specific findings of fact to support this rationale.  Logic would indicate that if ACC no longer engaged in credit analysis activities, then its need for office space would decrease, and it would take steps to reduce its rental and utility costs.  The same logic would apply even more so to printing, telephone, and computer costs.  There is nothing in the majority's findings to indicate that these were

---

[4]It should be noted in this regard that petitioners bear "the burden of clearly showing the right to the claimed deduction".  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

[5]The majority finds that ACC had a 5-year lease that began in October 1992.  There is no discussion of the specific terms of the lease other than the amount of monthly rent.

fixed costs.[6]  Approximately 75 percent[7] of the printing and telephone costs were attributable exclusively to ACC's credit analysis activities.  Ninety-five percent of the expenses for computers were related exclusively to ACC's credit analysis activities during the years in issue.  One can only wonder how the majority would have treated computer expenses if 100 percent of such expenses were allocable to ACC's credit analysis activities.

The majority provides no legal basis for distinguishing between expenditures for salaries and expenditures for "overhead" expenses.  Indeed, the majority correctly states that overhead expenses "are capital in nature to the extent that they originated in ACC's acquisition process, or, in other words, were directly related to ACC's anticipated acquisition of installment contracts."  Majority op. p. 29.  Therefore, my disagreement with the majority is based on what I view as the logical disconnect between the majority's specific findings of fact and the majority's rationale for concluding that the "overhead" expenses

---

[6]The majority notes a variation in printing, telephone, and computer costs from one year to another but does not identify the cause.  See majority op. pp. 29-30.

[7]For 1993, 75 percent of printing and telephone costs were attributable to ACC's credit analysis activities.  For 1994, 75 percent of printing costs and 60 percent of telephone costs were attributable to ACC's credit analysis activities.

were not directly related to ACC's credit analysis activities.

It is for that reason alone that I dissent.

WHALEN, HALPERN, BEGHE, FOLEY, GALE, and MARVEL, <u>JJ</u>., agree with this concurring in part and dissenting in part opinion.

HALPERN, J., concurring in part and dissenting in part: I concur in most of the majority's report, but, like Judge Ruwe, whom I join, I dissent from the majority's treatment of the overhead items--printing, telephone, computer, rent, and utilities (overhead).

I. Introduction

Petitioners' S corporation, Automotive Credit Corporation (ACC), cannot deduct its expenditures for the installment contracts here in question because such expenditures are capital in nature. They are capital in nature because each such expenditure purchases for ACC the right to receive monthly payments for a term ranging from 12 to 36 months. With respect to the overhead, the question is whether ACC may deduct its overhead costs related (but, in the majority's view, only indirectly related) to such capital expenditures. Principally for the reasons set forth by Judge Ruwe, I do not believe that they may. I write separately, however, to make the following points: (1) The majority distinguishes between directly related and indirectly related costs without telling us how to draw that distinction. In short, the majority uses the quality of relatedness not in support of any analysis but only to express a conclusion (i.e., the overhead was not directly related to ACC's capital expenditures). (2) The majority's analysis also risks confusion with existing law (and accounting principles) that distinguish "direct" costs from "indirect" costs. Moreover,

under that law (and those principles), indirect costs (including overhead) are often required to be capitalized. (3) To the extent the majority distinguishes directly related from indirectly related costs, it seems to be saying that fixed costs are period costs because they are only indirectly related to any capital expenditure. That is also not an accurate statement of current law (and accounting principles) that often require absorption or full costing methods of accounting for fixed costs. (4) The majority has ignored the proper mode of analysis, which is to determine whether ACC's accounting for overhead clearly reflects its income.

II.  Agreement of the Parties

The parties agree that the amounts identified by the majority as ACC's installment contract expenditures were "related" to ACC's credit analysis activities. Apparently, they agree that overhead was related to ACC's credit analysis activities because items such as the telephone and computers facilitated ACC's obtaining of credit reports and screening of credit histories. In turn, the credit reports and case histories assisted ACC's employees in determining that any particular installment contract presented a sufficiently low expectation of nonperformance to justify its purchase. ACC treated the installment contract expenditures (including overhead) disparately for financial accounting and Federal income tax

purpose, matching such expenditures to the expected life of the related installment contracts for financial accounting purposes but deducting them for Federal income tax purposes, at least for 1993.

## III. Majority's Approach

According to the majority: Overhead expenses must be capitalized only if they are directly related to the acquisition of a capital asset, and such expenses are directly related to the acquisition of a capital asset only to the extent that they increase on account of such acquisition. For the reasons discussed below, I do not believe that the majority's limitation of overhead costs subject to capitalization to (what I will refer to as) incremental overhead costs is an accurate application of the law, nor do I believe that it provides an improvement to the law relating to the treatment of overhead costs.

## IV. Overhead

Overhead is, by definition, an indirect cost. See, e.g., Kohler's Dictionary for Accountants 366 (Cooper & Ijiri, eds., 6th ed. 1983):

> overhead  1. Any cost of doing business other than a direct cost of an output of product or service.
> 2. A generic name for manufacturing costs of materials and services not readily identifiable with the products or services that constitute the main outputs of an operation.  * * *

A cost is an indirect cost, and, thus, overhead, if, at the time the cost is incurred, it is not identifiable with an individual

department, product, activity, or other object to be costed

(without distinction, costing unit).  Because overhead costs are

not identifiable with a costing unit, some process is necessary

to allocate overhead among costing units:

> Distinctions between overhead costs and direct
> costs rest upon the methods of measuring unit costs.
> Direct costs can be identified with units to be costed
> (i.e., with departments, activities, orders, products)
> at the time the cost is incurred.  This is accomplished
> by measuring quantities of materials and hours of labor
> used for each costing unit.  * * *

> Overhead costs cannot, as a practical matter, be
> traced directly to individual costing units, either
> because the process of making direct measurements is
> judged wasteful or because there is no acceptable
> method of direct measurement available.  As an example
> of a too costly measurement, electric power used by
> each department in a factory can be measured, but this
> is not always done because management does not wish to
> incur the expense of meters and records.  Examples of
> the lack of a method of distribution may be observed in
> any endeavor to determine how much of the cost incurred
> for plant protection, accounting, or the president's
> office applies to each unit of production.

Id. at 367.  As other authorities on accounting state:  "Indirect

expenses, by their very nature, can be assigned to departments

only by a process of allocation."  Meigs et al., Accounting, The

Basis for Business Decisions 820 (4th ed. 1977).

Although such process of allocation undoubtedly involves

many judgments and uncertainties, there are certain standards:

> Accounting literature is generally consistent in
> stating that indirect costs should be charged against
> operations as incurred if they have no arguable cause-
> and-effect relationship with future revenues (such as
> the salary of a mailroom clerk).  However, many
> allocations of indirect costs affect future periods; an

example is the allocation of factory overhead to units
of inventory produced during a period and remaining on
hand at period-end.

Minter et al., Handbook of Accounting and Auditing C2.06[4] (2001 ed.).  One area of uncertainty concerns the treatment of fixed overhead costs.  In Belkaoui, the Handbook of Cost Accounting Theory and Techniques 289 (1991), the author states:  "The issue of whether inventories should be costed at variable or full cost remains a subject of debate in both academic and business worlds.  The controversy centers mainly on two inventory valuation methods:  the direct or variable costing method and the absorption or full costing method."  That debate is relevant to our analysis since, as Professor Belkaoui states:  "The main difference between product costing methods lies in the accounting treatment of fixed manufacturing overhead.  Under the direct costing method, the fixed manufacturing overhead is regarded as a period cost (that is, an expired cost to be immediately charged against period sales). "  Id. at 291.  Under the absorption costing method, on the other hand, "all the manufacturing costs, whether variable or fixed, are treated as product costs and hence inventoried with the products."  Id.[1]  Fixed overhead, thus, is only released to offset receipts as it flows into cost of goods

---

[1]  Professor Belkaoui adds:  "Consequently, under absorption costing, the period costs are limited to both selling and administrative overhead."  Belkaoui, Handbook of Cost Accounting Theory and Techniques, 291 (1991).

sold (which may or may not be in the period such overhead is incurred).  See id. at 293.

Professor Belkaoui states that the central issue affecting income determination is whether fixed manufacturing costs are product or period costs.  Id. at 299.  He concludes:  "From the theoretical point of view, both methods [direct costing and absorption] appear to be internally consistent.  * * *  From the practical point of view as well, both methods have merit.  Thus, there is no absolute answer to whether a cost is a product or a period cost."  Id. at 305.

For financial accounting purposes, the treatment of overhead starts with the recognition that overhead costs are indirect and, thus, in need of allocation, and it proceeds from there to allocate such expenses pursuant to various standards, practices, and judgments, in order to serve management's (and other's) needs for information (including income determination).  See Kohler's Dictionary for Accountants  366-370 (Cooper & Ijiri eds., 6th ed. 1983).

Overhead presents no different challenge for Federal income tax purposes.  It is, thus, paradoxical that the majority's approach should be that all inquiry ends once it is determined that an overhead cost is only indirectly related to the purchase of a capital asset.

V.  Clear Reflection of Income

    A.  Introduction

    By characterizing the printing, telephone, computer, rent, and utilities costs here in question as overhead, petitioner and the majority do no more than identify that allocation is required.  In concluding that such costs need not be capitalized, the majority accepts without question ACC's allocation, which allocates the costs to ACC's postacquisition and servicing activities (for which an immediate deduction is available).  The majority fails to apply any criteria to its acceptance of ACC's allocation.  Notwithstanding that such allocation may be acceptable (even required) for financial accounting purposes, see majority op. p. 12 note 9, it still involves a method of accounting.  For Federal income tax purposes, the term "method of accounting" "includes not only the over-all method of accounting of the taxpayer but also the accounting treatment of any item." Sec. 1.446-1(a)(1), Income Tax Regs.; see also sec 1.446-1(e)(2)(ii)(a), Income Tax Regs. (a change in method of accounting includes any change in the treatment of any "material item":  "A material item is any item which involves the proper time for the inclusion of the item in income or the taking of a deduction."  (Emphasis added.)).  A taxpayer's method of accounting must clearly reflect income or the Secretary may require the computation of taxable income under a method of

accounting that does clearly reflect income.  See sec. 446(b).

Notwithstanding the majority's disclaimer that it is not passing

on whether ACC's method of accounting clearly reflected its

income, see majority op. p. 69 note 37, that is precisely what it

is doing.

B.  Clear Reflection and Section 263

We have previously addressed the interplay between the

clear-reflection standard and the requirements of section 263.

In Fort Howard Paper Co. v. Commissioner, 49 T.C. 275 (1967), the

core issue was how to treat overhead in determining the cost of

self-constructed assets.  We rejected the Commissioner's

principal argument that section 263 draws a clear line between

deductible expenses and capital expenditures.  We stated that

consideration necessarily had to be given to whether the

taxpayer's treatment of the overhead in question clearly

reflected income:

> We reject as without merit respondent's contention
> that section 263 of the Code is in and of itself
> dispositive of the issue before us.  By requiring the
> capitalization of amounts 'paid out for new buildings
> or for permanent improvements or betterments made to
> increase the value of any property,' such section begs
> the very question we are asked to answer.  We are
> satisfied that, under the circumstances involved
> herein, sections 263 and 446 are inextricably
> intertwined.  A contrary view would encase the general
> provisions of section 263 with an inflexibility and
> sterility neither mandated to carry out the intent of
> Congress nor required for the effective discharge of
> respondent's revenue-collecting responsibilities.
> Accordingly, we turn to a determination as to whether
> petitioner's method of accounting 'clearly reflects

income' pursuant to the provisions of section 446.
* * *

Id. at 283-284.

In Fort Howard Paper Co., we found the taxpayer's method of accounting clearly to reflect income notwithstanding that the taxpayer allocated no overhead to self-constructed property under the "incremental cost" method of accounting adopted by him.  The Commissioner argued for the "full absorption cost" method, which would have required an allocation of overhead to self-constructed assets.  We stated:

> Under all the circumstances herein, we hold that petitioner has satisfied its heavy burden and has convinced us that it employed a generally accepted method of accounting which 'clearly reflects its income.'  In so doing, we neither hold nor imply that, under all circumstances, a taxpayer has a right to choose between alternative generally accepted methods of accounting or that respondent may not, under some circumstances, require a taxpayer to accept his determination as to a preferred selection among such alternatives.  We hold merely that where a taxpayer, in a complicated area such as is involved herein, has over a long period of time consistently applied a generally accepted accounting method (which is considered 'clearly to reflect' income by competent professional authority and is not specifically in derogation of any provision of the Internal Revenue Code) and where this method has been frequently applied by respondent in making adjustments to the taxable income of the same taxpayer (as distinguished from respondent's mere failure to object to its use by such taxpayer), the taxpayer's choice of method will not be disturbed.
> * * *

Id. at 286-287 (citations omitted).  In Coors v. Commissioner, 60 T.C. 368, 397 (1973), affd. 519 F.2d 1280 (10th Cir. 1975), we distinguished Fort Howard Paper Co. and found the taxpayer's

method of accounting for the costs of self-constructed assets did not clearly reflect income, in part because it expensed incremental overhead costs.

In Dana Corp. v. United States, 174 F.3d 1344 (Fed. Cir. 1999), the taxpayer corporation paid a law firm an annual retainer fee, which was paid to prevent the law firm from representing parties adverse to the taxpayer in a takeover attempt and for standing by to represent the taxpayer both if subject to a hostile takeover and in other matters. Id. at 1346. The law firm received the retainer whether it rendered legal services during the retainer year or not. Id. at 1350. For some years it rendered no legal services and, during others, it rendered services in connection with deductible (non-capital) matters. Id. During the year in question, the law firm rendered services in connection with the taxpayer's acquisition of a capital asset and credited the year's retainer amount against the amount billed for those services. Id. For that year, the taxpayer deducted the retainer amount and capitalized the remaining fee. Id. The Court of Appeals disallowed the taxpayer's deduction of the retainer amount, stating: "Even though the retainer fees were allowed as deductible expenses for most of the years * * * [the taxpayer] paid them, the use of the fee in a particular year determines the deductibility of the expense in that year, and not the pattern of other years of

paying it." Id. at 1350-1351. Although that issue was not decided on the basis of clear reflection of income, the taxpayer was required to allocate a fixed cost incurred for multiple purposes to a single, capital expenditure purpose.

C. Criticism of Majority

My criticism of the majority is not, per se, with its finding that there were no incremental overhead costs attributable to capital expenditures (although I doubt that that is true). My criticism is with the majority's uncritical acceptance of the taxpayer's method of accounting for overhead. Judge Tannenwald's nuanced analysis in Fort Howard Paper Co. v. Commissioner, supra, exemplifies the considerations traditionally given to clear reflection of income cases. Consider also Judge Dawson's' analysis in Coors v. Commissioner, supra. The Supreme Court cases that figure so prominently in the majority's analysis, see majority op. p. 18, are inapposite. Simply, they do not address the accounting question here before us: Namely, does it clearly reflect ACC's income for Federal income tax purposes for ACC to use a method of accounting that allocates zero overhead to a costing unit (ACC's credit analysis activities) to which such overhead concededly relates? If ACC's accounting method is rejected, and some or all of the overhead is allocated to ACC's credit analysis activities, then, I suppose, such overhead would, in the majority's terminology, be directly

related to those activities, and the Supreme Court cases would be no bar to capitalization. The question here is not whether the overhead directly or indirectly relates to ACC's credit analysis activities; the question is whether ACC has proven that its method of accounting clearly reflects its income. It has not.

D. Majority's Reasoning

Once the majority's approach is stripped of the erroneous notion that overhead can, without allocation, be identified to an individual costing unit (e.g, a capital expenditure), what remains is an approach that says that, for Federal income tax purposes, overhead need not be allocated to a costing unit when, if that costing unit were eliminated, the overhead would still be incurred. Immediately, that approach raises analytic difficulties. What if the overhead is incurred on account of two costing units (one a capital expenditure and one not), and the overhead would be incurred in the same amount if either (but not both) were eliminated? Why is the default rule that the overhead is allocated in total to the noncapital expenditure? Looked at from a different perspective, what if there is not a linear relationship between the taxpayer's business activities and overhead? The relationship may be step-wise, so that the taxpayer's business activities would have to increase by some quantum before rent, for instance, would increase. Assume, for example, that office space may only be rented in blocks of

several thousand square feet.  There is, thus, no incremental cost in adding a capital activity to space not fully occupied by a noncapital activity.  Likewise, there is no decrement in cost (once having added the capital activity) of completely subtracting the noncapital activity.  Must we conclude that the rent still is not allocable to the capital activity?  The fact that a taxpayer would incur the same overhead costs should it discontinue a capital activity may only be evidence that it is amenable to an economically inefficient use of space or equipment.  Short of adopting the accounting concept of direct or variable costing as normative for Federal income tax purposes, that does not seem to me a sufficient reason to foreclose any capitalization of fixed overhead.  If the direct or variable costing method is to be made normative for Federal income tax purposes, that is a job for the Secretary or the Congress, not for us.

Besides which, as Judge Ruwe points out, the majority has made no specific findings of fact to support its conclusion that ACC's acquisition activities did not give rise to any incremental overhead.  Indeed, petitioner has proposed the following finding of fact:  "ACC's payroll and overhead costs attributable to credit review and other tasks relating to contract acquisition were not materially affected by whether any given installment contract was ultimately acquired by ACC from a dealership."

That, of course, is not to say that overhead would not be materially affected if none of the contract acquisition activity were continued.

VI. Conclusion

I am not here arguing for a rigid rule, requiring allocation of overhead in all cases where overhead is related to a capital activity. See, e.g, Dunlap v. Commissioner, 74 T.C. 1377, 1426 (1980) (no capitalization required for overhead where capital activity (acquisition of banks) was incidental to taxpayer's principal business of holding and managing banks, revd. and remanded on another issue 670 F.2d 785 (8th Cir. 1982)).[2]  I am,

_____

[2]  The majority states: "[W]e conclude that any future benefit that ACC realized from these expenses was incidental to its payment of them so as not to require capitalization". Majority op. p. 30.  The majority has failed, however, to explain or quantify that finding.  Without the overhead, the acquisition activity would, at the least, have been substantially reduced.

Judge Swift, in his concurring opinion, suggests that any benefit derived by ACC from both salaries and overhead associated with the credit analysis activities was incidental to ACC's primary business activity:  the holding of installment loans.  He would, therefore, permit a current deduction for both.  Judge Swift's position is based upon his finding that any benefits associated with the credit analysis activities "were exhausted or lost by ACC almost simultaneously with the receipt of the benefits"; i.e., most of the installment loans were immediately rejected.  Swift, J., concurring op., p. 73.  He also views such activities as "investigatory activities" the costs of which are currently deductible.

I believe that all of the credit analysis activities related to the purchased loans.  Therefore, the costs of that activity should be capitalized.  The acquisition of installment loans was an essential part of ACC's business, and an unavoidable cost of

(continued...)

however, arguing against what appears to be the rigid approach of the majority that, if the taxpayer's method of accounting for overhead is to deduct all overhead that does not increase on account of capital activities, such method of accounting clearly reflects income and, thus, must be accepted by respondent.

I can do no better than to close with the majority's own words:

> In our minds, an expenditure that produces both a current and long-term benefit is neither 100 percent deductible nor 100 percent capitalizable. Instead, regardless of whether the expenditure's primary or predominant purpose is to benefit significantly the business' current operation, on the one hand, or its long-term operation, on the other hand, the expenditure is capital in nature to the extent that it produces a significant long-term benefit and deductible to the remaining extent. * * *

Majority op. p. 61.

WHALEN and BEGHE, JJ. agree with this concurring in part and dissenting in part opinion.

---

[2](...continued)
such acquisitions was that associated with the need to distinguish between acceptable and unacceptable risks; i.e., the credit analysis activities. Put simply, the hunt was essential to the capture.

BEGHE, J., concurring in part and dissenting in part: Having joined the side opinions of Judges Ruwe and Halpern, I write on to empathize with the concerns that may underlie the majority's view on the treatment of the overhead costs, as amplified by Judge Swift's concurrence.

It bears observing that the oft-quoted passage in the opinion of the Court of Appeals for the Seventh Circuit in Encyclopaedia Britannica, Inc. v. Commissioner, 685 F.2d 212, 217 (7th Cir. 1982), revg. T.C. Memo. 1981-255, which includes the statement that "The administrative costs of conceptual rigor are too great," was uttered in the course of sustaining the Commissioner's determination that the costs in issue in that case had to be capitalized.  However, the Court of Appeals then suggested that the distinction between recurring and nonrecurring costs might provide the line of demarcation in some cases, but went on to observe that the distinction wouldn't make sense when the taxpayer's sole business was the creation or acquisition of capital assets.  Although ACC's business includes the servicing as well as the acquisition of capital assets, the relatively short average time the acquired loans remain outstanding raises questions about administrability, the costs of conceptual rigor, and whether the exercise has been worth the candle.

These musings lead me to suggest the time has come to request respectfully that the Congress step in and enact some

bright-line rules that will provide guidance to the business community and the Internal Revenue Service and reduce the burdens of compliance and controversy on the public, the Service, and the courts. Sections 195 and 197 come to mind as possible starting points or models.

GALE, <u>J</u>., agrees with this concurring in part and dissenting in part opinion.